**UNITED STATES of America**

v.

**Peter W. WEBER, Appellant.**

**No. 18251.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 18, 1970.

Decided Dec. 30, 1970.

Rehearings Denied Feb. 3, 1971.

Certiorari Denied April 26, 1971.
See 91 S.Ct. 1524.

---

17. *Id.*

Walter D. Van Riper, Newark, N. J. (Yankowitz, Tessler & Weisburd, Norman D. Weisburd, Newark, N. J., on the brief), for appellant.

Herbert J. Stern, Acting U. S. Atty., Newark, N. J. (Jonathan L. Goldstein, Asst. U. S. Atty., Newark, N. J., on the brief), for appellee.

Before BIGGS, SEITZ and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

After a trial in the District Court for the District of New Jersey, appellant Peter Weber was convicted on six counts of an eight-count indictment which charged him with violations of the Taft-Hartley Act, 29 U.S.C. § 186(b),[1] and of the Hobbs Act, 18 U.S.C. § 1951.[2] counts one, two, three and four charged Weber accepted cash payments from the H. C. Price Company (Price Company), which employed members of Weber's union; count five charged Weber used his powers as a union business manager to force Colonial Pipeline Company to withdraw a contract from the Osage Con-

---

1. 29 U.S.C. § 186(b) (1). It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by (a) of this section. 29 U.S.C. § 186(a). It shall be unlawful for any employer or association of employer or any person who acts as a labor relations expert, advisor, or consultant to an employer or who acts in the interest of any employer to pay, lend or deliver, or agree to pay, lend, or deliver, any money or other thing of value—(1) to any representative of any of his employ-

ees who are employed in an industry affecting commerce, * * *

2. 18 U.S.C. § 1951(a). Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspired so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years or both.

struction Company and to award it to Napp-Greco Corporation; count six charged Weber entered into a conspiracy to force Bechtel Corporation to award a subcontract to Joyce Construction Company; count seven charged Weber created unwarranted labor difficulties in order to force Bechtel to award a subcontract to Joyce; and count eight charged Weber conspired with employees of Joyce to violate the Taft-Hartley Act.

Weber was convicted on counts one, two, three, six, seven and eight and acquitted on counts four and five.

This appeal raises two important issues. First, Weber argues that the District Court should not have granted the Government's pre-trial motion, pursuant to Rule 13, Federal Rules of Criminal Procedure, to consolidate two separate indictments, because (a) the amount of prejudice resulting from the consolidation was so great the court abused its discretion by granting the motion, and (b) consolidation violated appellant's Fifth Amendment right not to be compelled to be a witness against himself. Second, Weber urges that hearsay testimony was improperly admitted at trial, because (a) the facts of this case do not warrant application of the co-conspirator hearsay exception, and (b) admission of extra-judicial statements of a witness deceased before trial violates the Sixth Amendment's guarantee of confrontation.

Weber was Business Manager of New Jersey Local Union 825, Operating Engineers. In 1963 the Price Company, an Oklahoma firm engaged in pipeline construction, opened an office in New Jersey to gain the advantages enjoyed by local companies when bidding on New Jersey contracts. The Price Company was particularly desirous to win a lucrative contract to construct a 90-mile New Jersey pipeline for Colonial. Prior to bidding on the Colonial contract, the Price Company established itself in New Jersey by constructing pipelines for the Algonquin Gas Company and Texas Eastern Transmission Company. While erecting these pipelines, Price Company officials noticed that competing construction companies operated under favorable labor conditions unavailable to Price Company.

The president of Price Company, Harold Price, directed his assistant, Roy Burgess, to travel from Oklahoma to New Jersey to meet with Weber in order to enlist Weber's aid in Price Company's dealings with Local 825. Price testified that Burgess reported to him that Weber wanted "tax-free cash." Price also testified that he decided to pay Weber money in order to induce Weber to use his union position to secure a lenient labor arrangement with Local 825. There was evidence that subsequent to Price's decision, Burgess traveled to New Jersey on at least three separate occasions. There was also evidence—which is questioned in this appeal—that Burgess paid Weber $3,500 on each of the three occasions. At the time the payments in question were made to Weber, the Price Company made a firm decision to bid on the Colonial Pipeline contract. Burgess was once again dispatched to New Jersey to learn the amount demanded by Weber for cooperation should Price Company win the Colonial contract. During the period in which Colonial was accepting bids for the New Jersey segment of the pipeline, Weber called Harold Price and told him that he (Weber) wanted Price Company to win the contract. Weber also called Glen Giles, General Manager of Construction for Colonial, to ask Giles to award the contract to the Price Company. Despite the telephone conversation, Giles awarded the contract to Bechtel, which had underbid the Price Company.

James Joyce testified that after Bechtel was awarded the New Jersey contract, Joyce entered into an arrangement with Weber: Weber would force Bechtel to subcontract to Joyce Construction Company the river crossings required by Bechtel's contract with Colonial, and in return, Joyce agreed to pay Weber $30,000. Bechtel at first intended to construct the river crossings itself, and refused to subcontract the work to Joyce

Company. Thereafter, Bechtel experienced labor difficulties, which culminated in a strike of the entire Colonial project in New Jersey. After a week Bechtel subcontracted the river crossings to Joyce and the strike terminated.

After a jury trial lasting twenty-four days, Weber was convicted on six, and acquitted on two, counts of the indictment. The Honorable Reynier Wortendyke fined Weber $10,000 on each of counts one, two, and three and sentenced him to two concurrent terms of ten years imprisonment on each of counts six and seven. Sentence was suspended on count eight.

I. A. *The pre-trial consolidation was not error.*

Weber argues that the District Court abused its discretion when prior to trial it consolidated the two indictments pursuant to the government's motion under Rule 13, Federal Rules of Criminal Procedure. The first indictment #321–67 included five counts. The first four charged that Weber accepted cash payments from the Price Company on four separate occasions in violation of the Taft-Hartley Act. The fifth count charged that Weber had induced Colonial to cancel its contract with Osage Construction Company and to award it to the Napp-Greco Corporation in violation of the Hobbs Act. Weber was acquitted on counts four and five. The

second indictment, #322–67, contained three counts. Count one charged a conspiracy to violate the Hobbs Act; count two charged that Weber, by creating labor strife, forced Bechtel to give a subcontract to Joyce Company in violation of the Hobbs Act; count three charged Weber conspired to accept $30,000 from Joyce in violation of the Taft-Hartley Act.

Rule 13, Federal Rules of Criminal Procedure,[3] grants the trial court wide discretion to consolidate indictments, provided that all the counts could have been joined in a single indictment under Rule 8, Federal Rules of Criminal Procedure.[4] The District Court's decision to consolidate under Rules 8 and 13 was a proper exercise of its discretion. The allegations of the indictment revealed a series of separate "transactions connected together," as well as "a common scheme," the results of which were the several crimes charged. Common to all the counts of the consolidated indictment was Weber's alleged scheme to accept monies from contractors working in New Jersey and employing members of Weber's union.

However, the fact that the consolidation was within the scope of Rules 8 and 13 does not dispose of Weber's objections, because Weber claims that consolidation created prejudice within the meaning of Rule 14.[5] Drew v. United

---

3. *Rule 13. Trial Together of Indictments or Informations*

 The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information.

4. *Rule 8. Joinder of Offenses and of Defendants*

 (a) *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act

or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

5. *Rule 14. Relief from Prejudicial Joinder*

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confession *made by the* defendants which the government intends to introduce in evidence at the trial.

States, 118 U.S.App.D.C. 11, 331 F.2d 85, 87 (1964); *cf.* Brown v. United States, 126 U.S.App.D.C. 134, 375 F.2d 310, 315 (1966), cert. denied, 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359.

■ In order to prevail on this argument, Weber, of course, must make an affirmative showing that the District Court abused its discretion when it refused to sever the two indictments. United States v. Barrow, 363 F.2d 62, 67 (3rd Cir. 1966), cert. denied 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). United States v. Lee, 428 F.2d 917, 920 (6th Cir. 1970).

Although it is unclear whether Weber raised the following points in the District Court, he now asserts that joinder was prejudicial because (1) the existence of separate counts and the resulting extensive testimony confused the jury (2) the charging of several crimes made the jury hostile (3) the jury was unable to segregate the evidence as to each count, and considered one crime as corroboration of the others.

■ Such allegations, if true and if timely made, would raise the questions to which Rule 14 addresses itself. Drew v. United States, *supra*, 331 F.2d at 88. However, the application of Rule 14 is best controlled by the District Court. We find no affirmative evidence showing that prejudice existed and, therefore, we do not find that the District Court abused its discretion. The consolidated indictment contained only eight counts, unlike Castellini v. United States, 64 F.2d 636 (6th Cir. 1933), a case cited by Weber, in which 26 counts were charged. Furthermore, here none of the counts charged Weber with crimes apt to arouse irrational hostility. Unlike Drew v. United States, *supra*, a case cited by Weber, in which the defendant was charged with two confusingly similar robberies, both involving High's Dairy Stores, the counts of the consolidated indictment did not charge crimes so similar that the jury was unable to segregate the evidence as to each count. Although all the counts in the consolidated indictment related to Weber's alleged misuse of his union office, the jury was not likely to confuse one alleged transaction with another, because the various construction companies involved had separate and distinct names. In *Drew* both robberies charged were of two separate High's Dairy Stores and consequently, the record revealed "that witnesses' responses at times indicated confusion as to which crime counsel were referring in their questions; the two crimes were repeatedly referred to as of the same order; and the prosecutor in his summation not unnaturally lumped the two together on occasion in his discussion of the evidence." Drew v. United States, *supra*, 331 F.2d at 93. We have examined the record here and have found no indication that witnesses, Weber's counsel, the prosecution, the Court, or the jury were unable to distinguish between evidence of separate events. Also, there is nothing in the record to indicate that the jury considered one count as corroboration for the others.

Whether the two indictments were consolidated or severed, it is possible that Weber would have been confronted with substantially the same evidence, because "evidence of each of the joined offenses would be admissible in a separate trial for the other." Baker v. United States, 131 U.S.App.D.C. 7, 401 F.2d 958, 974 (1968); see Drew v. United States, *supra*, 331 F.2d at 90.[5a] The test for the admission of evidence of other offenses is articulated in United States v. Stirone, 262 F.2d 571, 576 (3rd Cir. 1958), reversed on other grounds, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960): "Evidence of other offenses may be received if relevant for any purpose other than to show a mere propensi-

---

5a. The admission of the evidence would, of course, be within the sound discretion of the Trial Court and, even if relevant, the evidence might be excluded if the District Court found it to be unduly prejudicial. United States v. Stirone, *supra*, 262 F.2d at 576–577.

ty or disposition on the part of the defendant to commit a crime." It is interesting to note that the facts in *Stirone* were similar to those presented here. Stirone was a union official charged under the Hobbs Act with extorting money from a contractor employing members of Stirone's union. The district court admitted evidence relating to a labor extortion committed by Stirone subsequent to the crimes with which he was charged. Evidence of other wrongdoing was admitted to show Stirone's "determined plan for the levying of tribute." United States v. Stirone, 168 F.Supp. 490, 499 (W.D.Pa.1957).

Hence, evidence of each of Weber's alleged crimes was relevant to prove the other since each tended to demonstrate Weber's plan to control pipeline construction in New Jersey for his own pecuniary benefit, his motive, and the history of the transaction. See, United States v. Carter, 401 F.2d 748, 749 (3rd Cir. 1968), cert. denied, 393 U.S. 1103, 89 S.Ct. 905, 21 L.Ed.2d 797 (1969); Robinson v. United States, 366 F.2d 575, 578 (10th Cir. 1966); United States v. Laurelli, 293 F.2d 830, 832 (3rd Cir. 1961), cert. denied, 368 U.S. 961, 82 S. Ct. 406, 7 L.Ed.2d 392 (1952); 2 Wigmore § 304 (3rd ed. 1940); McCormick, Evidence (1954) at 328; Note, Other Crimes Evidence at Trial; Of Balancing and Other Matters, 70 Yale L.J. 763, 767 (1961). It follows, when all the factors are considered, that the District Court's decision to consolidate was within the spirit of Rules 5, 13, and 14—to relieve the government and the courts of the burden of repetitious trials. United States v. Nadler, 353 F.2d 570, 572 (2nd Cir. 1965); 8 J.Moore, Federal Practice § 8.02 (1967).

 Weber argues, without citing any cases, that since some of the counts may be characterized as *malum in se* and others as *malum prohibitum*, they may not be joined. In the absence of an affirmative showing of impermissible harm, the mere fact that the crimes carry different labels is not determinative. The jury acquitted Weber of one *malum in se* count and one *malum prohibitum* count. While the jury's acquittal of Weber on these two counts may not be dispositive of the question of prejudice, such action buttresses our conclusion that the jury was able to distinguish the evidence relating to one count from the evidence relating to the others.

Weber also argues to this Court that his trial strategy was to testify in his own defense on counts six, seven and eight which relate to the Bechtel extortion, but not to testify regarding counts one to four which relate to the cash payments from the Price Company.[6] Weber was silent, and continues to be so, as to whether he intended to testify regarding count five which relates to the charge he forced Colonial to give a contract to Napp-Greco. He maintains that the joinder of counts one to four with six to eight prevented the defense from following its strategy because Weber feared jury hostility to a defendant taking the stand as to some counts but remaining silent as to others. At trial he testified regarding all counts, denying the charges contained in each. Weber asserts that had there been separate trials, he would have taken the witness stand to refute the Bechtel charges, and would have relied upon the Fifth Amendment to avoid testifying regarding the Price charges.

The extent and strength of the Government's evidence was greater on the Bechtel counts than on the Price counts. On the Bechtel counts there was direct testimony from Weber's alleged co-conspirators to the effect that Weber had agreed to use his union position to force Bechtel to give a subcontract to Joyce. As a matter of trial tactics, Weber

6. The transcript indicates Weber asserted to the District Court he wished to testify regarding the Price counts, but not regarding the Bechtel counts. In his brief on appeal Weber says his strategy was the reverse, that it was his desire to testify regarding only the Bechtel counts.

might consider that denying the substance of the Government's case on the Bechtel counts would be vital to a successful defense. On the other hand Weber asserts that there were no such compelling considerations on the Price counts. The Government's evidence as to the Price charges depended to a great extent upon the introduction of hearsay statements made by an unavailable witness, Burgess. Since the jury could not weigh Weber's demeanor against the demeanor of Burgess, Weber could reasonably have concluded that taking the stand might detract from his defense.

■ Even assuming *arguendo* that Weber would have conducted his defense differently if there had been two trials instead of one, such does not demonstrate that the District Court abused its discretion in denying severance. Weber relies heavily upon Cross v. United States, 118 U.S.App.D.C. 324, 335 F.2d 987 (1964) to support his argument that when he informed the District Court he wished to testify as to some counts but not as to others, the Court was required to sever the counts. The *Cross* case does not reach as far as Weber indicates. In Baker v. United States, per curiam, 131 U.S.App.D.C. 7, 401 F.2d 958, 1968, cert. denied 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970), the Court of Appeals for the District of Columbia clarified the meaning of *Cross*:

> "Appellant cites *Cross* for the proposition that a 'timely and bona fide election by the accused to testify as to some counts and not as to others requires a Rule 14 severance.' We think that reading of *Cross* is far too broad. Such a rule, in fact, would divest the court of all control over the matter of severance and entrust it to the defendant." 401 F.2d at 976.

The *Baker* panel points out at 977 that the controlling factor in *Cross* was that the defendant was cross-examined "concerning his generally tawdry way of life and his prior convictions." Weber did not assert in the District Court, nor does he now claim, that he faced impeachment or other questions tending to show bad character. Accordingly, Weber has failed to demonstrate that the District Court abused its discretion by permitting consolidation.

B. Weber also asserts, without citing any cases directly supporting his argument, that consolidation violated the Fifth Amendment, because to testify regarding the Bechtel extortion counts he was "compelled" by the exigencies of a jury trial to take the stand regarding the Price transactions.

At the heart of this issue is Weber's theory that juries tend to infer guilt from a defendant's silence, particularly when silence as to one count is underscored by defendant's testimony denying other counts. Based on this proposition Weber argues that the Fifth Amendment was violated, because he desired to take the witness stand only to deny the Bechtel counts, and was "compelled" as a practical matter to testify as to the Price counts in order to prevent the jury from drawing an inference of guilt regarding the Bechtel counts.

■ It is clear that once a defendant takes the witness stand he waives his Fifth Amendment privilege and makes himself liable to cross-examination as an ordinary witness. Johnson v. United States, 318 U.S. 189, 195, 63 S.Ct. 549, 87 L.Ed. 704 (1943); Raffel v. United States, 271 U.S. 494, 497, 46 S.Ct. 566, 70 L.Ed. 1054 (1926); Fitzpatrick v. United States, 178 U.S. 304, 315, 20 S.Ct. 944, 44 L.Ed. 1078 (1900); 8 Wigmore, Evidence § 2276(2) (3rd Ed. 1940). Moreover, it is permissible, even in a trial upon a multi-count indictment, for the court to charge that a jury may draw an inference of guilt from a defendant's silence when the defendant testifies as to some facts, but refrains from testifying as to other facts within his knowledge. Caminetti v. United States, 242 U.S. 470, 494, 37 S.Ct. 192, 61 L.Ed. 442 (1917). Otherwise, by a selective reliance upon the Fifth Amendment to prevent cross-examination the defendant would be able to present a distorted fac-

tual picture by bringing to the jury's attention only those facts favorable to the defense. We are mindful of Weber's tactical difficulties, which flow from settled law, making it impossible for him to have testified regarding a single transaction in a chain of events. See, Note, Limited Waiver for Trial of Joined Offenses, 118 U.Pa.L.Rev. 424 (1970).

Nevertheless, as all other defendants in criminal trials, Weber was free to remain silent. His decision to testify resulted from strategic consideration of how to persuade a jury of his innocence. In Harrison v. United States, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed. 1047 (1968), the Court said in passing:

> "A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him."

The same principle applies to the situation where defendant's decision to take the witness stand is motivated by his counsel's assessment of effective jury trial tactics.[7]

■ Applying the Fifth Amendment to a case somewhat different from Weber's the Supreme Court reiterated what it said in *Harrison*—a defendant's response to the prosecution's lawful evidence does not rise to the level of compulsion. Williams v. Florida, 399 U.S. 78, 83–84, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). In reaching its decision that the Fifth Amendment does not forbid criminal discovery procedures requiring a defendant, prior to trial to give notice, including names and addresses of witnesses, to the government whenever the defendant intends to rely on an alibi defense, the Court noted,

> "The defendant in a criminal trial is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction. * * * That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination." 399 U.S. at 83–84, 90 S.Ct. at 1897.

Here, Weber does not suggest that he could not have remained silent had he so chosen. Weber's position is only that in order to counteract the persuasive evidence presented by the Government relating to the Bechtel counts, he wished to deny the charges through his own testimony and once having taken the witness stand for this purpose, he apparently thought it helpful to his defense before the jury to testify as to all the counts of the indictment. However, such tactical considerations did not "compel" Weber to testify in the sense proscribed by the Fifth Amendment. In addition, the record shows that Weber was not impeached by prior convictions, nor did cross examination elicit admissions of any wrongdoing.

II. *Admitting hearsay testimony was not reversible error.*

A. Weber argues that the District Court erred, as a matter of federal evidentiary law, when it admitted extrajudicial statements made by Burgess.

Burgess was an employee of the Price Company. The evidence showed that pursuant to Price's instructions, Burgess

---

7. It should be noted that in *Harrison* the Court held a defendant's testimony at one trial was inadmissible at a subsequent trial, because at the first trial the defendant testified in order to overcome the impact of an illegally obtained confession. In reaching its decision, the Court explained, " * * * the petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby— the fruit of the poisonous tree." 392 U.S. at 222, 88 S.Ct. at 2010. Our case does not raise the poisonous tree doctrine or analogous issues.

traveled to New Jersey on at least three occasions to meet Weber. Burgess died before trial. During the prosecution's case, the District Court permitted the Government to introduce hearsay testimony of extra-judicial statements made by Burgess indicating Burgess had paid monies to Weber. Overton, a Price Company employee, testified that Burgess said he was nervous and upset as a result of making payments to Weber. Allshouse, Burgess' secretary, testified, "Mr. Burgess told me that he was very worried, because he had this check sent to him and explained to me that this was a payment to Mr. Weber." Price testified that Burgess said he had paid money to Weber. It was the Government's theory that these extra-judicial statements were admissible under the co-conspirator exception to the hearsay rule.

Weber makes two objections to the admission of Burgess' out-of-court statements: first, the co-conspirator hearsay exception is available only when the declarant can be confronted in the courtroom and cross-examined; second, there was insufficient evidence, not including the Burgess statements, to connect Weber with the Price-Burgess conspiracy to pay money to Weber in exchange for favored treatment for the Price Company.

■ When the co-conspirator declarant is available as a witness, there is no doubt that hearsay principles do not prevent the introduction into evidence of extra-judicial statements made by the co-conspirator in furtherance of the conspiracy.[8] The fact that Burgess had died before trial strengthened, rather than weakened, the Government's argu-

ment for admitting the extra-judicial statements.[9] One of the rationales for permitting exceptions to the hearsay rule is necessity. Matthews v. United States, 217 F.2d 409, 417 (5th Cir. 1954); 5 Wigmore 1421 (3rd Ed. 1940). See Note, Preserving the Right to Confrontation, 113 U.Pa.L.Rev. 741, 747 (1965). When the co-conspirator has died before trial, there is greater justification to lay aside the hearsay rule, because there is greater necessity. Unless exception is made to the general hearsay rule, there is a risk that the evidence contained in the extra-judicial statements of a deceased co-conspirator would be lost entirely. As a matter of hearsay principles, if the co-conspirator exception is applicable when the declarant is alive, it follows that the extra-judicial statements of a dead co-conspirator are also admissible.[10]

■ As to Weber's second objection regarding the statements of the deceased witness, there was ample evidence, putting aside the hearsay itself, as we must, Glasser v. United States, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942), from which a jury could find the existence of a conspiracy involving Burgess and Weber.

This Circuit has held,

"Once the existence of a conspiracy is clearly, established, slight evidence may be sufficient to connect a defendant with it." United States v. Cohen, 197 F.2d 26 (3rd Cir. 1954).

Accord, United States v. Knight, 416 F.2d 1181, 1184 (9th Cir., 1969).

At trial there was clear evidence of a conspiracy between Price and Burgess.

8. e. g., Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1952); Krulewitch v. United States, 336 U.S. 440, 443, 69 S.Ct. 716, 93 L.Ed. 790 (1949); United States v. Gooding, 25 U.S. (12 Wheat) 460, 6 L. Ed. 693 (1827); McCormick, Evidence § 244 (1954); 4 Wigmore § 1079 (1940).

9. In United States v. Annunziato, 293 F.2d 373 (2nd Cir. 1961), a case remarkably similar to the present one, the declarations of a deceased co-con-

spirator were admitted into evidence. Judge Friendly, on behalf of an unanimous panel, rejected the argument that such testimony was inadmissible and did not even discuss the fact that the declarant, like Burgess, had died before trial.

10. At a later point in the opinion, we will discuss Weber's argument that the Confrontation Clause to the Constitution limits the co-conspirator exception to the hearsay rule.

Price testified that he, Bob Shivel, Price Company Vice President, Overton, and Burgess discussed various means to make secret payments to Weber in exchange for Weber's assistance in obtaining favorable labor conditions and also the Colonial contract. Price testified, too, that, as a result of these discussions, Burgess travelled to New Jersey to make the alleged payments to Weber. The evidence connecting Weber to the Price-Burgess conspiracy was sufficient to justify the jury's decision that Weber participated in that conspiracy.[11] That evidence included such overt acts as Weber's telephone call to Giles, demanding that Colonial give a contract to Price Company; Weber's telephone conversation with Price in which Weber said he wanted Price Company to win the Colonial contract; and Weber's meetings in New Jersey with Burgess.

B. Weber asserts that the admission of the Burgess hearsay statements violated his Sixth Amendment right to confront the witnesses against him.

The Supreme Court has consistently interpreted the Confrontation Clause as permitting traditional exceptions to the hearsay rule. Government of Virgin Islands v. Aquino, 378 F.2d 540, 547 (3rd Cir. 1967). See, Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); California v. Green, 399 U.S. 149, 155–156, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); Note, Preserving the Right to Confrontation, 113 U. of Pa.L.Rev. 741, 746 (1965). In Mattox v. United States, 156 U.S. 237, 242, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895), the Court explained,

"The primary object of the constitutional provision in question [Sixth Amendment, Confrontation Clause] was to prevent depositions or *ex parte*

affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury * * *"

Nevertheless, Justice Brown speaking for the Court in *Mattox* made it explicitly clear that the right to confrontation was never intended to prohibit the use of extra-judicial statements introduced into evidence through the common law exceptions to the hearsay rule. 156 U.S. 237, 243–244, 15 S.Ct. 337.

In Dowdell v. United States, 221 U.S. 325, 330, 31 S.Ct. 590, 592, 55 L.Ed. 753 (1911), the Court said,

"* * * this general rule of law [the right to confrontation] embodied in the Constitution * * *, and intended to secure the right of the accused to meet the witness face to face, and to thus sift the testimony produced against him, has always had certain well recognized exceptions."

And, in Snyder v. Massachusetts, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934), the Court said,

"Nor has the privilege of confrontation at any time been without recognized exceptions, as for instance dying declarations or documentary evidence."

In Delaney v. United States, 263 U.S. 586, 590, 44 S.Ct. 206, 207, 68 L.Ed. 462 (1924), the Supreme Court decided the precise issue before this Court by holding that the Confrontation Clause of the Sixth Amendment does not prevent the

---

11. The indictment did not charge a conspiracy between Weber, Price and Burgess, but that fact alone does not prevent the introduction of statements made by a co-conspirator.

"It is enough if evidence, other than that whose admissibility is under challenge, disclosed one [a conspiracy]. St.

Clair v. United States, 1894, 154 U.S. 134, 149, 14 S.Ct. 1002, 38 L.Ed. 936; United States v. Pugliese, 2 Cir. 1945, 153 F.2d 497, 500; People v. Luciano, 1938, 277 N.Y. 348, 14 N.E.2d 433." United States v. Annunziato, supra, at 378.

338

introduction of extra-judicial statements made by a dead co-conspirator:

"It is contended that hearsay evidence was received against petitioner, and this is erected into a charge of the deprivation of his Constitutional right to be confronted with the witnesses against him. Hearsay evidence can have that effect and its admission against objection constitute error. Diaz v. United States, 223 U.S. 442, 450, 32 S.Ct. 250, 56 L.Ed. 500; Ann. Cas.1913C, 1138; Rowland v. Boyle [St. Louis and San Francisco R. R. Co.], 244 U.S. 106, 108, 37 S.Ct. 577, 61 L.Ed. 1022; Spiller v. Atchison, Topeka and Santa Fe Ry. Co., 253 U.S. 117, 130, 40 S.Ct. 466, 64 L.Ed. 810 * * * The only exception, however, was of testimony given by one of the conspirators of what another one of the conspirators (the latter being dead) had told him, during the progress of the conspiracy. We think the testimony was competent and within the ruling of the cases. American Fur Co. v. United States, 2 Pet. 358, 7 L.Ed. 450. Nudd v. Burrows, 91 U.S. 426, 438, 23 L.Ed. 286; Wiborg v. United States, 163 U.S. 632, 16 S.Ct. 1127, 41 L.Ed. 289."

Recent Supreme Court cases—Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)—have expanded the Government's obligation to provide a defendant with the opportunity to cross-examine the witnesses testifying against him, when it is within the Government's power to do so. However, none of these decisions has altered the traditional understanding that the Confrontation Clause does not prohibit all hearsay exceptions, nor do any of the decisions involve statements made by a co-conspirator who had died before testifying. In *Pointer* the Supreme Court said, "This Court has recognized the admissibility

against an accused of dying declarations (citation omitted) and of testimony of a deceased witness who has testified at a former trial (citation omitted). Nothing we hold here is to the contrary." Further, the Court said, "There are other analogous situations which might not fall within the scope of the constitutional rule requiring confrontation of witnesses." 380 U.S. 400 at 407, 85 S.Ct. 1065 at 1070. In *Douglas*, after the prosecution called Douglas's alleged accomplice, Loyd, as a witness, Loyd invoked the Fifth Amendment and refused to testify. The trial court permitted the prosecution to read Loyd's alleged confession "under the guise of cross-examination to refresh Loyd's recollection" on the theory he was a hostile witness. The Court found a violation of the Sixth Amendment because Alabama's prosecution of Loyd caused him to refuse to testify and thus Alabama *by its own decision* made it impossible for Douglas's counsel to cross-examine. In *Barber* the Court decided only that the Government cannot rely upon a declarant's absence from the jurisdiction of the trial court to satisfy the unavailability requirement, when the declarant was imprisoned and could have been brought to trial pursuant to a federal statute. In *Bruton*, the Court held that the Confrontation Clause prohibited the introduction of an extrajudicial confession against one of two co-defendants but only when under traditional rules of evidence the confession was clearly inadmissible against the second defendant.

"We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, see Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790; Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196, the problem arising only because the statement was * * * admissible against the declarant Evans. * * * There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that

such exceptions necessarily raise questions under the Confrontation Clause." 391 U.S. at 128, footnote 3, 88 S.Ct. at 1673, footnote 3.

Courts of Appeal have decided that *Bruton* did not reach the question whether the Sixth Amendment prohibits the co-conspiracy exception to the hearsay rule. Parness v. United States, 415 F.2d 346 (3rd Cir. 1969); Campbell v. United States, 415 F.2d 356 (6th Cir. 1969).

The recent case of California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), also raises questions as to the constitutionality of hearsay exceptions the application of which result in the admission of statements when the defendant has not had the opportunity to cross-examine the declarant.[12] *Green* recognizes that the effect of the Confrontation Clause is to provide an accused with certain protections at trial: witnesses must testify under oath; the accused can cross-examine the witnesses; the jury can observe the witnesses' demeanor. 399 U.S. at 149, 90 S.Ct. 1930. However, we do not read *Green* to mean that an accused must have the benefit of such protections even when it is physically impossible for the Government to bring the witness to trial. *Green* does not overturn established law that the Sixth Amendment permits the introduction of evidence through some exceptions to the hearsay rule. Mr. Justice White, speaking for the Court, made it clear that the Court had "no occasion in the present case to map out a theory of the Confrontation Clause that would determine the validity of all such hearsay 'exceptions' permitting the introduction of an absent declarant's statements."[13] 399 U.S. 149 at 162, 90 S.Ct. 1930 at 1937. Mr. Justice Harlan, in an exhaustive concurring opinion in *Green,* expressed an interpretation of the Confrontation Clause consistent with prior Supreme Court decisions in the Sixth Amendment area:

"What I would hold binding on the States as a matter of due process is what I also deem the correct meaning of the Sixth Amendment's Confrontation Clause—that a State may not in a criminal case use hearsay when the declarant is available." 399 U.S. 149, 186, 90 S.Ct. 1930, 1949.[14]

In United States v. American Radiator and Standard Sanitary Corp., 433 F.2d 174 (3rd Cir., 1970), a criminal antitrust case, this Court decided that *Green* does not alter "our conclusion that we are bound by holdings that use of the co-conspirator exception does not violate the Confrontation Clause."[15] Had Burgess been alive at the time of trial and available to be subpoenaed by the Government, this case would present substantially different issues; but since the Government cannot be faulted for Burgess' absence from Weber's trial, and since *Delaney* controls the precise issue here, we hold that Weber's Sixth Amendment rights were not violated.

During the current term, the Supreme Court has decided Dutton v. Evans, *supra.* Writing for a plurality, Mr. Justice Stewart has re-affirmed the understanding articulated in prior decisions of the

12. "Viewed historically, then, there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, *as long as the declarant is testifying as a witness and subject to full and effective cross-examination.*" California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935 (1970) (emphasis added).

13. " * * * the precise holding of the Court today is that the Confrontation Clause of the Sixth Amendment does not preclude the introduction of an out-of-court declaration, taken under oath and subject to cross-examination, to prove the truth of the matters asserted therein, when the declarant is available as a witness at trial." California v. Green, *supra* 399 U.S. at 172, 90 S.Ct. at 1942 (Justice Harlan concurring).

14. Mr. Justice Harlan has recently stated that he has retreated from the view of the Sixth Amendment which he articulated in *Green.* Dutton v. Evans, *supra.*

15. At oral argument Weber's counsel acknowledged that Green v. California has not affected the constitutionality of the co-conspirator exception to the hearsay rule.

Court that the Sixth Amendment does not prohibit the introduction of all hearsay evidence. Indeed, as indicated in *Dutton* the federal evidentiary rules of hearsay may be more stringent than the constitutional limits embodied in the Sixth Amendment. *Dutton, supra,* 400 U.S. at 74, 91 S.Ct. 210. The circumstances under which Burgess made the declaration in question present the traditional hallmarks of reliability, because they were uttered spontaneously and they were against Burgess' penal interest, for the statements were an admission of a crime under the Taft-Hartley Act, 29 U.S.C. § 186(b) (1). It is clear from the record that Weber was afforded a full opportunity to cross-examine those witnesses who repeated Burgess' extra-judicial statements in order to test the accuracy of their testimony, and hence under the circumstances of this case there was no violation of the Sixth Amendment. *Dutton, supra,* at 74, 91 S.Ct. 210.

 Finally, there is no merit in Weber's remaining assignments of error. There was no violation of the First Amendment when evidence was introduced to prove that Weber associated with various executives of pipeline construction companies doing business in New Jersey. That evidence was produced to demonstrate that Weber had the opportunity to carry out the various crimes charged. Since we have examined all the errors alleged by Weber and have found no impermissible procedures, we cannot agree that viewing the trial in its entirety reveals a deprivation of due process.

The judgment of the District Court will be affirmed.

SEITZ, Circuit Judge (concurring).

I agree with the majority's disposition of Weber's argument concerning the co-conspirator hearsay exception.

With respect to Weber's arguments against consolidation, I concur in the result reached by the majority but I find it unnecessary to decide all the matters treated by them. Weber's claim that the consolidation itself compelled him to testify on the Price counts in violation of the Fifth Amendment overlooks the fact that, at a separate trial on those counts, evidence of the Bechtel transactions would still have been admissible to prove guilt circumstantially by showing a general plan by Weber to control construction of the New Jersey segment of the Colonial Pipeline for his own pecuniary benefit. The tactical reasons for Weber's desire to testify in rebuttal to the Bechtel evidence would have been equally compelling at a trial solely on the Price charges, and Weber does not now maintain that he might have changed his mind and remained silent on this evidence simply because it was used to prove some other crime. Thus, Weber would have faced the same evidence and the same testimonial dilemma regardless of consolidation. I believe that it is unnecessary to decide whether consolidation could create an unconstitutional degree of compulsion in a case where the evidence would not be mutually admissible at separate trials.

Apart from the constitutional issue, Weber was not "prejudiced" within the meaning of Rule 14. Since evidence concerning all eight counts would have been admissible at separate trials on each indictment, consolidation neither enlarged the possibility of an inference of criminal propensity nor confounded Weber in presenting his defense. Drew v. United States, 118 U.S.App.D.C. 11, 331 F.2d 85, 90 (1964).