**UNITED STATES of America**

v.

**Myron BUTTRAM.**

**Crim. No. 76–30 Erie.**

United States District Court,
W. D. Pennsylvania.

June 1, 1977.

James West, Pittsburgh, Pa., for plaintiff.

Leonard Ambrose, Erie, Pa., Roger Hanson, Santa Ana, Cal., for defendant.

## MEMORANDUM DENYING DEFENDANT'S MOTION FOR NEW TRIAL

KNOX, District Judge.

The defendant in this case, Myron Buttram, was convicted of one count of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 on September 25, 1976, at the conclusion of an eleven day jury trial. Buttram was acquitted of two other counts of wire fraud.

The indictment charged both Frank Exum and Myron Buttram with three counts of wire fraud. However, on September 14, 1976, the court granted an oral motion of Assistant United States Attorney James West dismissing all charges against Exum.

Exum had been sent to the Federal Psychiatric Center in Springfield, Missouri, pursuant to an order of Judge Luther B. Eubanks of the Western District of Oklahoma before whom Exum faced other federal charges unrelated to this case. Initially, on June 17, 1976, a report from Jack Eardly, M.D., Chief of Psychiatry at the Springfield facility adjudged Exum competent to stand trial. However, the Springfield staff changed their mind and in a letter dated August 9, 1976, from Eardly to Judge Eubanks found Exum to have been legally insane during the period he allegedly committed federal crimes in Oklahoma. This letter stated in part:

"Although at that time [June 17, 1976] we expressed an opinion that he could have been responsible, lacking information to the contrary, it is our considered opinion that in all likelihood, and using the criterion of reasonable medical certainty, he would have to be considered to have been suffering from a mental disease that would have incapacitated him to the extent that he lacked substantial capacity to appreciate the wrongfulness of his act or could not conform his conduct to the requirements of the law, considering patient's age and the apparent chronicity of his illness."

It was in reliance on this second letter of August 9, 1976, that Judge Eubanks agreed to dismiss all charges pending against Exum in Oklahoma. On September 14, 1976, this court also granted the government's motion to dismiss charges pending against Exum in this district.

The testimony at trial disclosed that an Erie businessman, J. Robert Baldwin, received a phone call from Frank Exum on October 1, 1975, inquiring about whether Baldwin was interested in investing money in a machine that extracted gold from thermal well waters in California. (Tr. 34). For an investment of $175,000, Mr. Baldwin was offered a one-fourth interest in such a machine. (Tr. 35). Exum represented that a well currently in operation in the Imperial Valley of California was producing over one million dollars a day in gold and $177,000 worth of silver and other metals.

Suspicious of possible fraud, Baldwin contacted the local office of the FBI and informed them of the call. Special Agent John Bokal came to Baldwin's office the following day, October 2, 1975 and a call was placed to Exum. The terms of the original offer were reconfirmed and Exum requested that Baldwin come to San Diego to view the machine.

These two phone calls constituted the basis for the first two counts of the indictment of which Buttram was ultimately acquitted. A third phone call occurred on October 8, 1975, at which time Baldwin spoke to both Exum and Buttram. This phone call constitutes the basis for Buttram's conviction of one count of wire fraud and will be discussed in detail in the next section of this memorandum, infra.

The court ruled at the time of trial that Baldwin could testify to Exum's phone calls of October 1 and 2, 1975 pursuant to Rule 801(d)(2)(C) and (D) of the Federal Rules of Evidence since the government's evidence established that Exum was an agent or tool of Buttram used in devising a scheme and artifice to defraud Baldwin. This ruling was made after extensive argument at trial and the matter has been extensively reargued in counsel's briefs and oral argument

concerning Buttram's motion for a new trial filed on October 4, 1976.

Defense counsel describes the court's alleged error in introducing this testimony as "the major issue on review of this conviction". Most of the remaining extensive arguments before this court by the defendant in support of a new trial concern the alleged insufficiency of the evidence to support a conviction on the third count of wire fraud. In a third miscellaneous category fall several attacks by the defendant on other rulings made by the court throughout the eleven day trial.

After considerable reflection about this complicated case, the court has decided to reaffirm its previous rulings on all legal issues and to uphold the jury's verdict as to Count 3 as being supported by sufficient evidence to sustain conviction beyond a reasonable doubt. Accordingly, the defendant's motion for new trial has been denied.

### (1) Admission Into Evidence of Testimony Concerning Out of Court Declarations of Frank Exum

To be properly admissible against Myron Buttram, the out of court statements made in the October 1 and 2, 1975, phone calls by Exum to Baldwin must meet the requirements of two separate tests: they must fall within one of the exceptions to the hearsay rule and they must not violate Buttram's sixth amendment right to confront witnesses.

In the case of *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Supreme Court made it clear that the hearsay rules and the confrontation clause pose separate problems in a criminal case although there is a great deal of overlap:

"While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence."

With regard to the hearsay problem, two theories were propounded by the government at trial to justify admission of the Exum phone calls: the co-conspirator exception to the hearsay rule and the hearsay exception for admissions by an agent.

Defense counsel argued at trial that the conspiracy exception could not apply because Buttram could not have conspired with the legally insane Exum. Even though the court did not discover any cases holding that it is legally impossible to conspire to commit a crime with an insane person, the court did not reach this question at the time of trial and based its ruling instead on the agency exception to the hearsay rule.

The admission by an agent exception to the hearsay rule is codified in Rule 801(d)(2)(C) and (D) of the Federal Rules of Evidence:

"(d) Statements which are not hearsay. A statement is not hearsay if—

\* \* \* \* \* \*

(2) Admission by party opponent. The statement is offered against a party and is

\* \* \* \* \* \*

(C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship."

Defense counsel argues that this exception does not apply to an insane or mentally irresponsible agent. It appears to the court, however, that Exum's insanity is irrelevant to the operation of this hearsay exception and the only issue is whether or not the evidence at trial supported the existence of an agency-principal relationship between Exum and Buttram. Otherwise, Exum's insanity would serve to insulate Buttram from the consequences of criminal actions performed by his authorized agent.

It would seem to follow from the defendant's argument that one could train a mechanical robot, a wild animal, or a mentally retarded human to kill and be immune from criminal prosecution.

■ The court would also note that legal liability for the actions of irresponsible agents appears to be contemplated under 18 U.S.C. § 2 on which the jury was instructed in the court's charge.

"2. Principals.—(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

The court in *United States v. Grasso*, 356 F.Supp. 814, 819 (E.D.Pa.1973) made the following comments about 18 U.S.C. § 2:

"Section 2 has two subsections. Although the conduct described in § 2(a) is apparently broad enough to overlap that described in § 2(b), it is clear that section 2, taken as a whole, proscribes two distinct forms of conduct: (1) participation in a criminal plan involving others who act with a criminal state of mind, and (2) *the commission of a crime by the use of an innocent or irresponsible agent.*" [Emphasis added.]

The evidence also indicates that in the third phone call of October 8, 1975, Buttram adopted and ratified the misrepresentations of Exum.

■ The court therefore adheres to its prior ruling at trial that Buttram is responsible for the actions of Exum so long as the government's evidence sustains the existence of an agency-principal relationship.

The government presented persuasive evidence at trial of an agent-principal relationship between Exum and Buttram. For instance the representations by Exum to Baldwin concerning potential gold recoveries in excess of one million dollars a day were allegedly based on certain assay reports, Government's Exhibits 1–5, procured by Buttram. Barbara Smith, another government witness, testified that she made copies of these exhibits received from Buttram and gave them to Exum and another salesman, Brad Melton. Buttram admitted having given Exum two assays (G. Ex 1 and 2) with the specific intent of having Exum display these to potential investors. (T. 1199–1200). He also testified to travels to Kentucky, Tennessee, Alabama, Louisiana and Oklahoma with Exum allegedly to discuss oil recovery with investors. Buttram however admitted that the electrohydraulic process was discussed with at least two individuals during the trip. Mr. Baldwin described his impression of the Exum Buttram relationship as follows: "Mr. Exum's position was that of more or less of a salesman. Mr. Buttram was the man we were doing business with."

■ The defendant also argues that the jury's acquittal of Buttram on Counts 1 and 2 amounts to a finding that Exum was not Buttram's agent. With respect to this argument, the court would point out that there is no requirement that a jury explain its verdict and consistency in verdicts is not required. *Hamling v. U. S.*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590, rehearing denied, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974); *U. S. ex rel. Wojtycha v. Hopkins*, 517 F.2d 420 (3d Cir. 1975). Therefore, it is improper to read anything into the jury's acquittal of Buttram on Counts 1 and 2. And at any rate, questions as to the admissibility of evidence are for the court, not the jury to decide.

■ The defendant's reliance on the case of *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) is also misplaced. In *Ashe*, the Supreme Court ruled that a defendant could not be tried for the robbery of one of six poker players after having been previously acquitted of the robbery of another of the poker players. This holding was based on the concepts of collateral estoppel and double jeopardy which clearly apply to a defendant facing two separate trials but clearly have no rele-

vance to one defendant facing *one* trial on two or more counts.

For all of the above reasons, the first prong of the *Green* test has been met and testimony concerning the Exum phone calls is admissible under the hearsay exception found in Rule 801(d)(2)(C) or (D) of the Federal Rules of Evidence. The court will now proceed to discuss the Sixth Amendment confrontation problem.

*California v. Green,* supra, while announcing the divergence of the hearsay and confrontation issues, did not set up any test to determine when admissible hearsay might violate the dictates of the confrontation clause in a criminal case.[1] The court ruled in *Green* that admission of the prior testimony of a witness did not violate the confrontation clause in light of the present right to cross examine the witness about prior statements.

The Supreme Court, however, had occasion to further elucidate upon the confrontation clause problem in the case of *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). In *Dutton* the defendant was convicted of murder in a Georgia court; the state having presented 20 witnesses including an eyewitness who described in detail the defendant's participation with others in the murder. The trial court had admitted the testimony of a federal prisoner who said that an accomplice of the defendant's had told him in prison that if it had not been for the defendant "we wouldn't be in this now". The accomplice

did not take the witness stand but the trial court ruled this evidence admissible under the co-conspirators exception to the hearsay rule.

Justice Stewart wrote a plurality opinion representing the views of three other justices. Stewart found that admission of the hearsay statements of the prisoner did not violate the confrontation clause for two reasons: (1) this evidence was not crucial to the government or devastating to the defendant and the statement contained strong indicia of reliability.[2]

Justices Blackmun and Burger concurred in Stewart's opinion but added as "an additional reason for the result" that admission of the hearsay was "harmless error if it was error at all". 400 U.S. at 90, 91 S.Ct. at 220, 27 L.Ed.2d at 228. Thus, it seems fair to say that six justices concurred in the substance of Justice Stewart's opinion.

Two opinions of the Third Circuit, both written in 1970, have discussed *Green,* supra and *Dutton,* supra. In *United States v. American Radiator and Standard Sanitary Corp.,* 433 F.2d 174 (3d Cir. 1970), the court held that *Green* does not alter "our conclusion that we are bound by holdings that use of the co-conspirator exception does not violate the Confrontation Clause."

In *United States v. Weber,* 437 F.2d 327, 339 (3d Cir. 1970), the court made the following comments about Green:

1. "We have no occasion in the present case to map out a theory of the Confrontation Clause that would determine the validity of all such hearsay 'exceptions' permitting the introduction of an absent declarant's statements." 399 U.S. at 162, 90 S.Ct. at 1937, 26 L.Ed.2d at 499.

2. The court found the following indicia of reliability, 400 U.S. at 88, 91 S.Ct. at 219, 27 L.Ed.2d at 227:

"First, the statement contained no express assertion about past fact, and consequently it carried on its face a warning to the jury against giving the statement undue weight. Second, Williams' personal knowledge of the identity and role of the other participants in the triple murder is abundantly established by Truett's testimony and by Williams' prior conviction. It is inconceivable that cross-examination could have shown that Williams

was not in a position to know whether or not Evans was involved in the murder. Third, the possibility that Williams' statement was founded on faulty recollection is remote in the extreme. Fourth, the circumstances under which Williams made the statement were such as to give reason to suppose that Williams did not misrepresent Evans' involvement in the crime. These circumstances go beyond a showing that Willimas had no apparent reason to lie to Shaw. His statement was spontaneous, and it was against his penal interest to make it. These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant."

"*Green* does not overturn established law that the Sixth Amendment permits the introduction of evidence through some exceptions to the hearsay rule."

The court made the following comment about *Dutton*:

"During the current term, the Supreme Court has decided *Dutton v. Evans*, supra. Writing for a plurality, Mr. Justice Stewart has re-affirmed the understanding articulated in prior decisions of the court that the Sixth Amendment does not prohibit the introduction of all hearsay evidence. Indeed, as indicated in *Dutton* the federal evidentiary rules of hearsay may be more stringent than the constitutional limits embodied in the Sixth Amendment." 437 F.2d at 339–40.

In *Weber*, the court held that hearsay declarations of a dead co-conspirator were properly admissible against the defendant finding that the out of court declarations possessed "the traditional hallmarks of reliability". The Third Circuit has not discussed *Dutton* since these two 1970 opinions.

■ It is thus apparent that *Dutton* and *Green* require the court to make a case by case determination as to whether hearsay declarations admissible under an exception to the rule must nevertheless be suppressed under the Sixth Amendment's confrontation clause. Several decisions have admitted such hearsay primarily due to its reliability, *Weber* supra and *United States v. Puco*, 476 F.2d 1099 (2d Cir. 1973); *U. S. ex rel. Henson v. Redman*, 419 F.Supp. 678 (D.Del.1976), while other decisions have emphasized the peripheral significance of the evidence to the government's case. *United States v. Adams*, 446 F.2d 681 (9th Cir.) cert. den. 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971).

■ In this case, evidence of Exum's phone calls is admissible under the second aspect of *Dutton* —while there is little reliability in anything the mentally deranged Exum may have said, his statements were not crucial to the government nor devastating to the defense.

The fact that Buttram was acquitted of the first two counts of the indictment indicates that the jury discounted the importance of Exum's statements. Furthermore, the primary reliance placed by the jury on statements made by Buttram during the third phone call in reaching their verdict is clearly evident from their request that the transcript of the third phone call be read back by the court reporter. The court has also carefully reviewed this portion of the transcript and rules that the third phone call constitutes sufficient evidence of misrepresentations made by Buttram independently of Exum to overcome any confrontation objections arising from *Dutton* and *Green*. Also, we note that Buttram was present during the first part of the phone call and did not repudiate Exum's statements.

Baldwin testified that on October 8, 1975, he first spoke with Exum who introduced Buttram as "the man who was worth over five hundred million and who could buy and sell me ten times over". (T. 45–46). Baldwin testified further that his intent at this point was "to confirm the elements of the proposal which Frank Evans [a pseudonym of Frank Exum] had made to me, namely, that the gold was being extracted from these wells". (T. 46)

During the subsequent conversation, Buttram confirmed that "we are talking about gold and lots of it". (T. 49) and that "we are talking about real gold". (T. 108) Buttram further represented that he expected a total return of 200 million dollars a day from his total investments. (T. 47, 49, 120) Finally, Baldwin was careful to confirm the exact details of Exum's proposal with Buttram:

"Q. All right, and so is it fair in saying that the bulk of all the things you know about this well and the process that we have talked about here as you testified that came from this gentlemen called Exum?

"A. Except that I tried in the conversation I had with Mr. Buttram on the elements of the proposal that Mr. Exum had outlayed during these number of conversations.

"Q. That would be where you were to turn over a hundred seventy-five thousand.

"A. The amount of money and the operating expenses, what the $175,000 was for and what we were going to get out of it and that gold was being extracted." (T. 118–119)

The court therefore determines that the jury's verdict of innocent as to the two phone calls from Exum to Baldwin coupled with the request to reread Baldwin's testimony about Buttram's statements indicates that the crucial and devastating evidence in the government's case was based on statements made by Buttram rather than Exum. The court would also observe that Mr. Baldwin was a substantial and well known local businessman whose word the jury was likely to trust. Additional evidence of Buttram's guilt will be discussed in the next section of this memorandum, infra.

For all of the above reasons, the court adheres to its ruling at trial that out of court statements by the allegedly deranged Exum were admissible in the government's case against Buttram.

### (2) Weight of Evidence Supporting the Verdict.

■■■ The Supreme Court of the United States and this Circuit have articulated the proper standard for reviewing the evidence in support of a jury verdict as follows:

"As was said by the Supreme Court in *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942): 'It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.'" *U. S. v. Provenzano*, 334 F.2d 678, 683, 684 (3rd Cir. 1964).

This Circuit further stated in *U. S. v. Hamilton*, 457 F.2d 95 (3d Cir. 1972):

"[E]vidence need not be inconsistent with every conclusion save that of guilt, provided it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt."

The nature of the representations made by Exum and Buttram to Mr. Baldwin have already been discussed at length. It remains for the court to determine that these representations were made fraudulently as part of a scheme and artifice to defraud Mr. Baldwin so as to meet the requirements of the mail fraud statute 18 U.S.C. § 1343.[3]

To begin with, Buttram had to explain away to the jury the inherent incredibility of any scheme which could make one million dollars a day from one well or 200 million dollars a day from several wells by producing gold from water. The defendant concedes that there was never any significant possibility of gold or silver recovery from the Imperial Valley of California.

The defendant contends, however, that the machine actually works in the sense that it can extract gold or other metals from water. It is true that Dr. Wesley has a patent on the electrohydraulic process. The defendant further contends that Dr. Wesley put an erroneous formula on the assay report from the Silver States Laboratory (Government's Ex. No. 1) escalating the correct amount of the potential recovery from Jack Maisson's well in the Imperial Valley of California by a factor of thousands. Buttram allegedly relied on this inherently incredible assay report in making projections of recoveries of one million dollars a day and in trying to sell gold recovery machines for a period of over one year.

A number of factors undercut the reliability of this theory of the case. In the first place, Barbara Smith testified that Buttram directed her to remove his name from the assay reports (G. Ex 1–5); evidence which is consistent with an attempt to cover up responsibility for these assay reports.

Buttram was provided with two assay reports in 1975 which indicated that the potential recovery of gold and silver in the

---

**3.** The court instructed the jury that the essential elements of the government's proof in a wire fraud case were in accordance with Devitt and Blackmar Federal Jury Practice and Instructions § 40.05.

Imperial Valley of California was practically nil. On December 23, 1975, Dr. Frank Soday tested Jack Maisson's well at the request of a potential investor, M. B. Kay, and found that it contained practically no gold and silver. And on August 19, 1975, another potential investor had an independent assay performed by Effat Botros which showed that Dr. Wesley's machine had practically no effect on the gold and silver in the water and that very little gold or silver was in the water tested. (T. 479, 742–46).

Buttram never informed his two biggest investors, Sonny Daniels and Edmund Pruitt, of these two negative assays. Furthermore, Buttram falsely represented to Pruitt in the presence of Daniels that it was not necessary to check the assay reports because he had already done so. Buttram also never informed Pruitt and Daniels of the fact that Jack Maisson's well was plugged until at least September 6, 1975, after Pruitt had signed an agreement. (T. 542, 716, 8)

Further misrepresentations by Buttram were testified to by Dr. Frank Soday. Buttram told Dr. Soday that he had worked on the process six years as a scientist (T. 325) and that tests from five independent laboratories around the country established that $283,000 a day in gold and silver could be removed from an abandoned CCC camp well in the Imperial Valley of California by a machine capable of processing 60,000 gallons of water a day. Soday was positive that Buttram said that five laboratories had tested the water with identical results. (T. 356–59).

Two points were strongly argued by the defendant as negating any intent to defraud. First, all of the witnesses' testimony was in accord on the point that Exum and Buttram represented that no money was to pass until Baldwin's representatives were satisfied with a demonstration of the machine. (See transcript of Baldwin testimony t. 38, 71, 76, 80, 89, 96, 97, 98, 99; transcript of FBI Agent Bokal's testimony t. 155–186; transcript of Barbara Smith's testimony t. 222–264; transcript of Dr. Wesley's testimony t. 1052; transcript of Buttram's testimony t. 1199–1205). Yet the government's evidence disclosed that individual investors had put over $250,000 into the electrohydraulic process in reliance on the assay reports supplied by Buttram. In addition, an individual named M. B. Kay was committed to a $150,000 investment on October 17, 1975, but withdrew after Buttram's arrest. Buttram was arrested in California before he had a chance to demonstrate the machine to the two FBI agents representing Baldwin.

Exum and Buttram therefore may have felt it possible to con Baldwin into investing a large sum of money in an untested and unworkable project based on the false projections in the assay reports. There was some evidence presented at trial that the machine does work in the sense that it can extract some sediment from water. Thus, Baldwin's representatives may have been shown some small quantities of gold and been led to invest in reliance on the false projections in the assay reports. The court also notes that a scheme and artifice to defraud need not be successful to violate the mail fraud statute.[4]

The second point strongly pressed by the defendant as negating any intent to defraud is the fact that Buttram worked on the machine in the Imperial Valley of California after his arrest in October 1975 to April 1976 and invested large sums of his own money. However, this conduct is consistent with an attempt to cover up or to create an impression of legitimacy in the gold recovery process. By this time, Buttram had been told by at least four people of the inaccuracy of the inflated assay reports: Dr. Soday, Effat Buttros, Dr. Wesley and his own attorney, himself a PhD in electrical engineering who informed Buttram in his office that the key equation in G. Ex 1—one milligram equals one ounce—

---

4. The jury was instructed in this regard according to Devitt and Blackmar Federal Jury Practice § 40.09, Gist of the Offense.

was false. To continue to press forward with the project in the face of such overwhelming evidence of its impracticality would seem to be consistent with an elaborate cover-up.

 For all of the above reasons, the court has concluded that the evidence viewed in the light most favorable to the government, substantially supports Buttram's conviction of wire fraud. It remains to consider a few miscellaneous objections to rulings at trial now raised by the defendant.

### (3) Miscellaneous arguments of the Defendant.

At one point in the testimony of Baldwin at trial, the court directed Buttram to state: "We are talking about gold." (T. 111) so that Baldwin could identify Buttram's voice. Baldwin did identify the voice, stating: "The voice I heard was the same voice." (T. 112). The defendant argues that this evidence should not have been admitted because it is inherently suggestive in violation of *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

However, two circuits have recently ruled that a witness may testify as to his recognition of the accused's voice, provided he had some basis for comparison of the accused's voice with the voice which he identifies as the accused's. *U. S. v. Ladd*, 527 F.2d 1341 (5th Cir. 1976); *U. S. v. Turner*, 528 F.2d 143 (9th Cir. 1975). The court would also observe that it is now established that a defendant has no constitutional right to a line-up. *U. S. v. Estremera*, 531 F.2d 1103 (2d Cir. 1976). Although this principle usually applies to physical comparisons, the same principle would seem to apply to a line-up to compare voices. The court thus rules that it was proper for Buttram to make an in court statement so that Baldwin could identify his voice.

A second miscellaneous argument of the defendant is that the FBI agents who traveled to Texas and California as Buttram's agents illegally seized G. Ex 1–5

from Barbara Smith. The court fails to see how Buttram has any standing to object to this seizure since the evidence at trial disclosed that Buttram gave these exhibits to Exum as his salesman to show to third parties to induce purchases of gold recovery machines. Thus, Buttram authorized delivery of these exhibits to the two FBI agents who represented themselves as prospective purchasers of the machine.

The defendant's motion for new trial has therefore been denied.