**ST. JOHN MORTGAGE COMPANY, INC., Appellant,**

v.

**UNITED STATES FIDELITY AND GUARANTY CO. and Lewis O. Funkhouser, Appellees.**

No. 89–1388.

United States Court of Appeals, Third Circuit.

Argued Nov. 27, 1989.

Decided March 13, 1990.

Rehearing and Rehearing In Banc Denied April 5, 1990.

---

Harold E. Kohn, Jeanne P. Wrobleski (argued), Kohn, Savett, Klein & Graf, P.C. (Martin J. Aronstein, of counsel), Morgan, Lewis & Bockius, Philadelphia, Pa., for appellant.

Arthur H. Rainey (argued), Kate D. Balaban, James R. O'Dell, Dechert Price & Rhoads, Philadelphia, Pa., for appellees.

Before SLOVITER and BECKER, Circuit Judges, and LIFLAND, District Judge [*].

## OPINION OF THE COURT

LIFLAND, District Judge.

Plaintiff St. John Mortgage Company, Inc. ("St. John") appeals from the district court's grant of summary judgment to defendants United States Fidelity and Guaranty Company ("USF & G") and Lewis Funkhouser ("Funkhouser"). The district court held that even if an oral agreement existed between the parties, it was not enforceable in the absence of a signed writing, by virtue of two Pennsylvania statute of frauds provisions—13 Pa.C.S.A. § 1206, governing sales of personal property, and 13 Pa.C.S.A. § 8319, governing sales of

[*] Hon. John C. Lifland, United States District Judge for the District of New Jersey, sitting by designation.

securities. For the reasons set forth below, we reverse.

## I.

St. John is a Delaware corporation engaged in real estate investment and financing. USF & G is a Maryland-based insurance company, and Funkhouser is a former Assistant Vice President of USF & G.

The parties agree that they met on February 27, 1986 to discuss the transaction which is at the heart of this lawsuit. Under the terms of the deal being discussed, St. John was to form a wholly-owned subsidiary, American Sentry Corporation ("ASC"). USF & G would lend ASC $12 million. ASC would use the proceeds of this loan and of a first mortgage loan from an unrelated party to purchase fifteen parcels of real estate from St. John. ASC was to repay USF & G the principal, with interest at the rate of 17.125%, over a ten-year period. To secure payment of the loan, a Guarantee and Pledge Agreement was to provide that in the event of a default, USF & G would receive all the stock of ASC, thereby assuming control of that company and the properties. In addition, at the end of the ten year period, USF & G would receive an "equity kicker" of a specified percentage of the proceeds of the sale or refinancing of the properties or of the then appraised value.

While the parties agree on these basic terms of the deal,[1] they dispute the outcome of the February 27, 1986 meeting. St. John claims that Funkhouser orally agreed on behalf of USF & G to enter into the proposed agreement. USF & G and Funkhouser contend that no agreement was reached. According to USF & G and Funkhouser, the parties simply agreed to continue to negotiate in the hope that some agreement might be reached at a future time.[2]

Following the February 27, 1986 meeting, the law firm representing St. John began to prepare drafts of documents and to circulate them for review and comment. Between March 3 and March 7, 1986, an attorney from the firm prepared several drafts of a "Debenture," as well as a draft "Bond Purchase Agreement." None of these documents was ever executed.

On March 20, 1986, USF & G announced it would not participate in the deal. St. John responded by filing a three count complaint alleging breach of contract, fraud and civil conspiracy. USF & G and Funkhouser moved for summary judgment on all counts. By order dated December 22, 1988, the district court granted defendants' motion for summary judgment as to the breach of contract claim and denied the motion for summary judgment as to the fraud and conspiracy claims.[3] Our review of the district court's grant of summary judgment on the breach of contract claim is plenary. *Childers v. Joseph*, 842 F.2d 689, 693 (3d Cir.1988).

## II.

■ The basis for the grant of summary judgment on the breach of contract claim was the district court's conclusion that the transaction between the parties was the sale of a bond, that a bond is personal property under Pennsylvania law, and that enforcement of the transaction was barred by either 13 Pa.C.S.A. § 1206, the statute of frauds governing the sale of personal property, or 13 Pa.C.S.A. § 8319, the statute of frauds governing the sale of securities.

In concluding that the transaction was the sale of a bond, the district court conducted an exhaustive review of the record. However, it focused on the means the parties chose to memorialize the transaction rather than on the character of the transaction itself. For instance, the district court

---

1. For purposes of their motion for summary judgment only, USF & G and Funkhouser conceded these provisions of the oral agreement. (30–36A).

2. This court of course expresses no view as to the merits of this dispute.

3. The parties have stipulated to dismissal with prejudice of the claims for fraud and conspiracy, thus rendering the judgment final, 28 U.S.C. § 1291.

was impressed by the fact that one of the closing documents was to be a "bond." The district court also noted that St. John's complaint refers to a "proposed 'purchase' of a $12,000,000 debenture" and that the " 'debt would be evidenced by a bond ... and a bond purchase agreement....' " (619A). The district court's opinion also indicated that Mr. Sabat, a lawyer from the firm representing St. John, drafted a "Bond Purchase Agreement." *Id.* The district court quoted from Sabat's deposition testimony where he stated that " 'you normally have this type of document ... in transactions of this type.' " *Id.* The district court further noted that the Bond Purchase Agreement referred to a "bond" and that it described USF & G as the purchaser of the bond. *Id.*

The district court also remarked that the parties themselves referred to the agreement as a bond. For instance, the court cited Sabat's deposition testimony where he stated that during the February 27, 1986 meeting he discussed the "bond purchase agreement." (619A–620A). The court referenced a letter in which Sabat stated that in order to close the proposed transaction "the new corporation must sell to an insurance company a very unique type of bond ..." (620A). In addition, the district court's opinion noted that the minutes of St. John's Board of Directors meeting prepared by in-house counsel refer to the agreement as the " 'purchase [of] the debt instrument of a corporation.' " *Id.*

We agree with the district court that the parties intended the transaction to have the appearance of the purchase of a "bond." However, there is evidence which indicates that the real substance of the transaction may have been merely an agreement to make a loan, and the "bond" language may have been used by the parties for some other purpose. As the district court remarked:

St. John structured the transaction in this way to permit USF & G to provide the financing in compliance with Maryland insurance regulations. The transaction was so structured because the Maryland insurance regulatory authorities would not permit USF & G to give St.

John a loan secured by a second mortgage.

(666A). Having decided to formalize the deal in the form of the purchase of a bond, the parties spoke of the transaction in those terms. And, not surprisingly, counsel drafted such documents as a Bond Purchase Agreement.

However, this does not resolve what we find to be a genuine issue of material fact as to whether the alleged transaction was the sale of a bond or was an agreement to make a loan, which is not within the Pennsylvania Statute of Frauds. The record indicates that the substance of the transaction may have been more than the mere sale of a bond. As noted by the district court, in a letter describing the transaction, Sabat did state that the transaction would require the sale "to an insurance company [of] a very unique type of bond." (64A–65A). In the same letter, he explained that the transaction would require extensive documentation because:

(a) fifteen properties in seven states must be transferred and then mortgaged, (b) a new corporation must be created, qualified in seven states, and then acquire three other corporations, which will then be liquidated, (c) partnership interests must be transferred, and the partnership liquidated, (d) the new corporation must sell to an insurance company a very unique type of bond, and (e) the various persons involved in the aborted partnership syndication must decide among themselves how they will participate in the proposed financing.

(64A–65A). Many more documents than the Bond Purchase Agreement would have been required to close the transaction. In fact, Sabat estimated that over 450 separate documents would be necessary. The extent of the documentation required is reflected in the closing checklist.

The basic terms of the transaction alleged in this case were that USF & G would lend twelve million dollars to ASC, a subsidiary of St. John. The subsidiary would use the money to purchase several properties from St. John. Principal and

interest would be repaid to USF & G over a ten year period. Security for the loan was a guarantee and pledge agreement. ASC's debt to USF & G could have been documented as easily in a note purchase agreement as a bond purchase agreement. We feel that the district court focused too narrowly in confining its analysis to the memorialization of the transaction, i.e. the "bond" intended to document the transaction, and the parties' references to the "bond," rather than the substance of the transaction itself. Accordingly, the district court erred in concluding that the alleged transaction was, as a matter of law, the sale of a bond.

Having found a genuine issue of material fact as to whether the alleged agreement was a loan or a sale, we do not reach the question of what was "sold." There is no record before us on whether this is personal property or not. If the district court determines that there was an agreement to sell a bond, it must then determine whether this bond was personal property within the meaning of 13 Pa.C.S.A. § 1206.[4] If it is not, it would not fall under the statute of frauds.

### III.

■ USF & G and Funkhouser also urge this court to hold that enforcement of the alleged oral agreement is barred by the Pennsylvania statute of frauds applicable to transactions involving a transfer of an interest in real estate, 33 Pa.C.S.A. § 1. While the parties briefed the issue below, the district court did not reach the issue of the statute's applicability. On review of the district court's grant of summary judgment, this court may consider grounds not evaluated by the district court. *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156–57 n. 6, 25 L.Ed.2d 491 (1969), *rehearing denied,* 398 U.S. 914, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970).

The statute involving transfers of interests in land provides, inter alia:

[N]o leases, estates or interests, either of freehold or terms of years, or any uncertain interest, of, in, to or out of any messuages, manors, lands, tenements or hereditaments, shall, at any time after the said April 10, 1772, be assigned, granted or surrendered, unless it be by deed or note, in writing, signed by the party so assigning, granting or surrendering the same, or their agents, thereto lawfully authorized by writing, or by act and operation of law.

33 Pa.C.S.A. § 1.

USF & G and Funkhouser argue that the "equity kicker" provision in the agreement constitutes the transfer of an interest in land. The equity kicker provided that the parties would share in either the profits from the resale of the properties or the increase in appraisal value of the properties. If the properties were transferred or conveyed, the equity kicker entitled USF & G to a share of the proceeds of such a transfer or conveyance. In the event the properties were not transferred or conveyed before the maturity of the bond, the equity kicker provided for appraisal of the real estate, with USF & G entitled to a share in the appreciation of the properties.

We reject USF & G and Funkhouser's statute of frauds argument based on 33 Pa.C.S.A. § 1. The equity kicker is designed to operate with or without a transfer of an interest in land, and in any event its operation would be remote enough in time and value to make it more akin to an interest in future profits than to an interest in land.

USF & G and Funkhouser argue that there is a clear statement of Pennsylvania law compelling this court to hold that Pennsylvania's real estate statute of frauds bars enforcement of the proposed transaction. We disagree; Pennsylvania law appears to be to the contrary. In *Everhart's Appeal,* 106 Pa. 349 at 354 (1884), the Supreme Court of Pennsylvania quoted with approval the rule previously announced in *Benjamin v. Zell,* 100 Pa. 33 (1882):

---

**4.** In the briefs submitted to this court, both parties agreed that the proposed bond would not constitute a security under 13 Pa.C.S.A.

§ 8102. Brief of Appellants, pp. 21–25; Brief of Appellees, pp. 21–22 n. 4.

[I]n *Benjamin v. Zell*, ... we held that an interest in contingent profits arising from a sale of real estate to be made thereafter, does not amount to an interest in the land itself within the meaning of the Statute of Frauds.

In *Benjamin v. Zell*, plaintiffs sued to recover a portion of the profits realized by the defendant from the sale of a parcel of real estate. The court specifically noted that the alleged obligation to share the profits did not affect the title to the land. Plaintiffs' claim was found to be based on a contract for services, contingent on defendant's resale of the land at a profit. The court ruled that "(a)n interest in contingent profits arising from a sale to be thereafter made, does not give rise to an interest in the land itself." *Benjamin v. Zell, supra,* 100 Pa. at 37.

The Supreme Court of Pennsylvania has cited *Benjamin v. Zell* in later cases. *See Howell v. Kelly,* 149 Pa. 473, 24 A. 224 (1892); *McBride v. Western Pennsylvania Paper Co.,* 263 Pa. 345, 106 A. 720 (1919). However, in *Davis v. Hillman,* 288 Pa. 16, 135 A. 254 (1926), the Pennsylvania Supreme Court refused to enforce an oral agreement for contingent profits because the land had not actually been sold at a profit. The holding of *Davis v. Hillman* is that there was no cause of action because no profits were yet realized. *See* 288 Pa. at 22–23, 135 A. 254. Indeed, the Court specifically noted that there was no allegation that the defendant had disposed of the land at a profit or had in his possession any money to which the plaintiff was entitled. The Court did not indicate any intention to overrule *Benjamin v. Zell;* on the contrary, the opinion cites both *Benjamin v. Zell* and *Everhart's Appeal* with approval. *Davis v. Hillman* recognized that the statute of frauds barred a parol agreement that created an interest in land, but did not refer to the language quoted above from *Everhart's Appeal* and *Benjamin v. Zell,* which established that an interest in land did not arise from an interest in contingent profits from the sale of land. Thus, *Davis v. Hillman's* application of the real estate statute of frauds can be fairly characterized as dictum, given the fact that the *Davis* court already had a clear basis for decision in the holding that there was no allegation of profits arising from the sale of the land in question. We have no doubt that the Supreme Court of Pennsylvania, if faced today with this question, would resolve it as we do, given the facts of this case, the well-established rules set forth in *Benjamin v. Zell* and *Everhart's Appeal,* and the absence of any expressed intention by the *Davis v. Hillman* court to overrule those cases.

We conclude that there is no Pennsylvania precedent supporting application of the real estate statute of frauds to bar enforcement of the proposed transaction. The equity kicker does not provide for conveyance to USF & G of any ownership, title or tenancy in any of the properties. No security interest in the property itself was reflected in the alleged oral agreement. At all events the operation of the equity kicker would be remote enough in time and value to make it more akin to an interest in future profits than to an interest in land. Accordingly, we hold that the equity kicker does not bring the alleged agreement within the purview of 33 Pa.S.A. § 1.

### IV.

We conclude that the district court erred in holding that the alleged oral agreement was, as a matter of law, a contract for the sale of a bond. We further conclude that 33 Pa.S.A. § 1 does not present a bar to enforcement of the proposed transaction. Accordingly, the order of the district court will be reversed and the case remanded for further proceedings consistent with this opinion.