James R. DENISON, and Theresa M. Denison, Plaintiffs,

v.

Steven D. KELLY, and Legg Mason Wood Walker, Inc., Defendants.

Civ. A. No. 1:CV–90–1733.

United States District Court, M.D. Pennsylvania.

March 20, 1991.

Jeffrey F. Smith, Keefer Wood Allen & Rahal, Harrisburg, Pa., for plaintiffs.

Steven D. Kelly, New Bern, N.C., pro se.

Diane M. Tokarsky, McNees Wallace & Nurick, Harrisburg, Pa., Andrew J. Bowden and Sherry H. Flax, Weinberg & Green, Baltimore, Md., for Legg Mason Wood Walker, Inc.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

Defendant, Legg Mason Wood Walker, Inc. (Legg Mason), has filed a motion to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6). The plaintiffs, James R. Denison and his wife, Theresa M. Denison, filed this lawsuit against Legg Mason, a stock brokerage, and the other defendant, Steven D. Kelly, a former broker for Legg Mason, alleging that the defendants had churned their account and had purchased investments inappropriate to the plaintiffs' stated desire for long term growth and appreciation. In considering defendant's motion, we must accept as true all the well pleaded allegations of the amended complaint and construe them favorably to the plaintiffs. The motion cannot be granted unless the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Labov v. Lalley,* 809 F.2d 220 (3d Cir.1987).

The amended complaint sets forth the following causes of action: (1) Count I—a claim pursuant to section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and its corresponding rule, 17 C.F.R. § 240.10(b)–5; (2) Counts II and III—claims pursuant to section 501 of the Pennsylvania Securities Act of 1972 (the Securities Act) for purported violations of sections 401 and 403 of that Act, 70 P.S. §§ 1–501, 1–401 and 1–403 (Purdon Supp. 1990–91); (3) Counts IV through X—pendent state law claims, respectively, for breach of contract, breach of fiduciary duty, negligence, common law conversion (Counts VII and VIII), fraud, and civil conspiracy; (4) Count XI—a claim for a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (hereinafter "the CPL"), 73 P.S. § 201–1 (Purdon Supp.1990–91); and (5) Count XII—a claim under the Racketeer Influenced And Corrupt Organizations Act (RICO). 18 U.S.C. § 1961 *et seq.*

### II. *Discussion.*

#### A. *The RICO Claim (Count XII).*

■ Plaintiffs' RICO claim is based upon 18 U.S.C. § 1962(a) which provides, in pertinent part, as follows:

It shall be unlawful for any person who has received any income derived, directly or indirectly from a pattern of racketeering activity ... in which such person has participated as a principal within the meaning of section 2, title 18, United

States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

Legg Mason attacks the sufficiency of this claim on three grounds, contending that the plaintiffs have failed to plead that it has participated as a principal in a pattern of racketeering activity, citing *First National Bank v. Lustig,* 727 F.Supp. 276 (E.D.La.1989) on this issue, that the pattern of racketeering activity that has been pled is not sufficient, *see Banks v. Wolk,* 918 F.2d 418 (3d Cir.1990), and that the plaintiffs have failed to plead injury from the investment or use of income derived from a pattern of racketeering activity in an enterprise engaged in or affecting interstate commerce. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406 (3d Cir. 1991); *Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989). Defendant contends each of these deficiencies is an independent ground for dismissal of the RICO claim.

Plaintiffs admit that they have not alleged that Legg Mason participated as a principal in the racketeering activity or that it aided and abetted Kelly, and that this is a necessary part of the particular theory under which they have chosen to pursue Legg Mason on their RICO claim. They assert, however, that, given the "size" of Legg Mason, "fairness" requires that they be permitted to engage in some discovery to determine the extent of Legg Mason's involvement with Kelly's wrongful handling of their account. (plaintiffs' opposition brief at p. 33). They also cite *United States v. Buttram,* 432 F.Supp. 1269 (W.D. Pa.1977) for the proposition that Legg Mason can be found liable as a principal under 18 U.S.C. § 2 when its agent Kelly has been "irresponsible." (plaintiffs' opposition brief at p. 33).

We fail to see the relevance of *Buttram* to the instant case. The court in *Buttram* decided that a criminal defendant could be found guilty as the principal of an accomplice who was legally insane at the time of the offenses. The adjudication of guilt as a principal depended on the conduct of the defendant, not the mental state of the accomplice. *Buttram* simply has no bearing on this case.

As to the asserted need for discovery, we have generally prohibited a plaintiff from trying to cure deficiencies in a complaint by engaging in discovery. *See Humphrey v. Court of Common Pleas,* 640 F.Supp. 1239 (M.D.Pa.1986). This approach is consistent with Fed.R.Civ.P. 11 which contemplates that a party's attorney will sign the complaint only *"after* reasonable inquiry" establishes that the complaint "is well grounded in fact and is warranted by existing law...." (emphasis added). *See also Kaylor v. Fields,* 661 F.2d 1177, 1184 (8th Cir.1981) ("Discovery should follow the filing of a well-pleaded complaint. It is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim."); *Avnet, Inc. v. American Motorists Insurance Co.,* 115 F.R.D. 588 (S.D.N.Y.1987).

There may be circumstances in which we would permit discovery to proceed even though a complaint has failed to state an essential element of a plaintiff's chosen theory of recovery. But we do not think that the mere size of the defendant or a general plea for fairness justifies doing so. Accordingly, we conclude that the complaint fails to state a RICO claim because it does not allege that Legg Mason was a principal in a pattern of racketeering activity or aided and abetted that activity.

In any event, we agree with Legg Mason's third ground for dismissal of the RICO claim. Plaintiffs have failed to allege that they have been injured by the use or investment of income derived from a pattern of racketeering activity, or the proceeds thereof, in an enterprise in, or affecting, interstate commerce. This is a required element of a cause of action under section 1962(a). *See Kehr Packages, supra; Rose, supra; Zimmer v. Gruntal & Co.,* 732 F.Supp. 1330 (W.D.Pa.1989).

■ Plaintiffs' brief attempts to satisfy this burden by pointing to that portion of

paragraph 85(B)(3) of the plaintiffs' amended complaint which predicates Legg Mason's RICO liability on the mere use or investment of the income derived from the plaintiffs by its racketeering activity in its business. This allegation is still insufficient for a section 1962(a) claim. *See Leonard v. Shearson Lehman/American Express Inc.*, 687 F.Supp. 177 (E.D.Pa.1988) (investment of racketeering income in a business affecting interstate commerce is insufficient for a RICO claim). *See also Bhatla v. Resort Development Corp.*, 720 F.Supp. 501, 508 (W.D.Pa.1989) (liability under § 1962(a) cannot be predicated upon the "mere receipt of money derived from a pattern of racketeering activity" nor solely on its "investment in an enterprise affecting interstate commerce"). We recognize that *Roche v. E.F. Hutton & Co., Inc.*, 658 F.Supp. 315 (M.D.Pa.1986) is to the contrary but that case was decided prior to the Third Circuit's decision in *Rose, supra.*

For the foregoing reasons, the plaintiffs' RICO claim against Legg Mason will be dismissed.[1]

### B. *The Consumer Protection Act Claim (Count XI).*

■ Legg Mason next contends that the plaintiffs cannot make a claim under the CPL for alleged wrongdoing arising from securities transactions. Legg Mason makes this claim despite the very broad language of the CPL which seemingly covers the conduct at issue.

The CPL declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined in [section 201–2(4)(i) through xvii]...." (brackets added). 73 P.S. § 201–3. Trade and commerce are defined, in part, as "the sale or distribution of any services...." *Id.* at § 201–2(3). Section 201–2, after enumerating several specific unfair trade practices, contains a catch-all provision, which the plaintiffs rely on, defining an unfair method of competition as "any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201–2(4)(xii). Further, section 201–9.2, in pertinent part, authorizes individuals to sue for violations of section 201–3, when they purchase "services primarily for personal, family or household purposes...." Finally, the CPL contains a specific exemption only for radio, television and newspapers acting in good faith. 73 P.S. § 201–3. It does not similarly exempt from its coverage the business of securities.

Thus, plaintiffs appear to meet all the requirements of the CPL. They allege that they purchased the defendant's brokerage services for their personal portfolio and that they suffered injury because the defendant engaged in fraudulent conduct in connection with the handling of their account.

Despite the broad scope and remedial nature of the CPL, defendant contends it provides the plaintiffs no relief, citing in its support cases from other jurisdictions which have held for a variety of reasons that consumer protection laws with language comparable to Pennsylvania's do not extend to securities transactions. *See Spinner Corp. v. Princeville Development Corp.*, 849 F.2d 388 (9th Cir.1988) (Hawaii law); *Stephenson v. Paine, Webber, Jackson & Curtis, Inc.*, 839 F.2d 1095 (5th Cir.1988) (Louisiana law); *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162 (4th Cir.1985) (North Carolina law); *Skinner v. E.F. Hutton Co., Inc.*, 314 N.C. 267, 333 S.E.2d 236 (1985) (North Carolina law); *Swenson v. Englestad*, 626 F.2d 421 (5th Cir.1980) (Texas law); *Nichols v. Merrill Lynch Pierce Fenner & Smith*, 706 F.Supp. 1309 (M.D.Tenn.1989); *In re Catanella*, 583 F.Supp. 1388 (E.D.Pa.1984) (New

---

1. Based upon the above analysis, we see no need to consider defendant's contention that plaintiffs' RICO pattern allegations are insufficient. We do note, however, that, while the allegations of the amended complaint may have required further amendment in that regard, plaintiffs may have been able to plead and prove the necessary pattern. We think a suffi-

ciently specific allegation that Kelly had done the same things to other customers would satisfy that part of the pattern requirement that there exist a threat of continuing wrongful activity. *See Swistock v. Jones*, 884 F.2d 755 (3d Cir.1989). Of course, the above analysis also eliminates the need to consider the defendant's constitutional challenge to RICO.

Jersey law); *Taylor v. Bear Sterns*, 572 F.Supp. 667 (N.D.Ga.1983) (Georgia law); *Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 510 A.2d 972 (1986) (Connecticut law); *Cabot Corp. v. Baddour*, 394 Mass. 720, 477 N.E.2d 399 (1985) (Massachusetts law); *State ex rel. McLeod v. Rhoades*, 275 S.C. 104, 267 S.E.2d 539 (1980) (South Carolina law); *State v. Piedmont Funding Corp.*, 119 R.I. 695, 382 A.2d 819 (1978) (Rhode Island law).

We have carefully reviewed these cases and we must agree with the plaintiffs that they cannot control the outcome here. Initially, we note that *Rhoades* and *Piedmont Funding* are easily distinguishable because the consumer protection laws at issue in those cases contained specific exemptions for conduct regulated or permitted by governmental agencies or statute. The CPL contains no similar exemption.

The remaining cases share what appear to be the typical reasons for refusing to allow a securities claim under state consumer protection laws. Thus, it is noted that some of these laws were patterned after the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a)(1), and the latter statute has never been construed as applying to securities transactions. *See Stephenson, Lindner, Skinner* and *Russell*. Moreover, previous state court reliance on the FTC Act for guidance in construing these laws has also been viewed as an indication that consumer protection laws should not be read to encompass securities transactions. *See Stephenson*. The comprehensive nature of state securities laws, which often provide private remedies substantively different from the applicable consumer protection laws, lead some courts to conclude they should not interfere with legislative statutory schemes supposedly providing coordinated coverage in different areas. *See Spinner, Lindner, Nichols, Cabot, In re Catanella, Skinner* and *Russell*.

Other reasons include: (1) the availability of treble damages under consumer protection laws, but not under state securities laws, which makes it unlikely that state legislatures intended the more liberal consumer remedy to be available for securities violations, *see Spinner, Stephenson, Lindner* and *Skinner;* (2) the potential for an undesirable overlapping of authority between state officials in charge of consumer protection and those in charge of securities regulation, *see Stephenson, Lindner* and *Skinner;* (3) simply the federal predominance in the area of securities transactions, *see Nichols;* and that (4) securities transactions are just qualitatively different from the usual run of consumer transactions intended to be covered by consumer protection laws. *See In re Catanella.*

These reasons all have some validity and the issue is certainly arguable. But our review of Pennsylvania law leads us to believe that the Pennsylvania Supreme Court would approach the issue differently.

To begin with, we believe the supreme court would look first to the language of the statute rather than engage in a somewhat loose analysis, independent of the statutory language, of what the Pennsylvania General Assembly intended to be covered by the CPL. Of course, the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly," 1 Pa. C.S. § 1921(a), but "[w]hen the words of a statute are clear and free from all ambiguity," *id.* at § 1921(b) (brackets added), that intent should be found in the statutory language itself. *See Coretsky v. Board of Commissioners*, 520 Pa. 513, 555 A.2d 72 (1989); *In re Estate of Fox*, 494 Pa. 584, 431 A.2d 1008 (1981); *Garcia v. Community Legal Services Corp.*, 362 Pa.Super. 484, 524 A.2d 980 (1987). As noted above, and as the moving defendant concedes, the relevant sections of the CPL plainly and unambiguously cover the alleged conduct of the defendants in connection with the security transactions at issue in the instant case.

The cases cited by defendant also seem to be greatly concerned about the need to coordinate comprehensive, but potentially overlapping, statutory schemes. They do not wish to disturb the schemes by permitting an overlap. Conversely, we do not believe that Pennsylvania courts would view coordination as an overriding concern.

Rather, the issue would simply be whether the General Assembly "intended the [Securities Act] and the CPL to coexist as independent statutory mechanisms or whether the [Securities Act] is intended to provide the sole and exclusive statutory penalty for alleged" securities violations. *Pekular v. Eich*, 355 Pa.Super. 276, 289, 513 A.2d 427, 433 (1986) (brackets added). If the General Assembly intended the former, then, despite the comprehensiveness of the Securities Act, a claim could be brought under the CPL as well as that Act.

*Pekular* is instructive although it dealt with whether a violation of the Unfair Insurance Practices Act (UIPA), 40 P.S. § 1171.1 *et seq.* (Purdon Pamphlet 1990–91), could also be redressed under the CPL. The superior court held that it could, despite the broad and sweeping language of the UIPA. In its support, the court noted the remedial nature of the CPL, prior Pennsylvania cases in which violations of other statutes had been held to be redressable under the CPL, and that section 201–3 provided certain exemptions from the CPL but did not include insurance companies or their agents within the exemption. Comparing the two statutes, the court also found no irreconcilable conflict prohibiting enforcement of them both:

> The UIPA vests the Insurance Commissioner with the power to investigate specifically defined acts and practices of insurers, to levy limited monetary penalties, and to suspend or revoke licenses. The CPL on the other hand affords an aggrieved consumer a private statutory remedy by which he may receive compensation for statutorily defined wrongs done to him in the course of any trade or business. We see no inconsistency between the UIPA providing for administrative investigation and an imposition of limited penalties and the CPL providing a means by which a consumer may privately seek compensation for wrongs allegedly suffered. Our conclusion that there is no inherent irreconcilable conflict is supported by the fact that the UIPA contains no provision either stating or implying that the power vested in the Insurance Commissioner represents the exclusive means by which an insurer's unfair or deceptive acts are to be penalized or that the insured is precluded from seeking private compensation for damages incurred.

*Id.* at 289–90, 513 A.2d at 434.

We think the same rationale applies here although, unlike the UIPA, the Securities Act does provide a private cause of action. The key, however, is that there is no irreconcilable conflict. Both laws can operate at the same time. We must therefore enforce them both. *Id.* We thus reject the defendant's contention, which relies upon 1 Pa.C.S. § 1933, that the specific statute must override the general simply because they both can be applied to securities transactions. Section 1933 imposes the further requirement that there be an "irreconcilable" conflict before the more specific statute prevails.

It is also significant that, like the UIPA, the Securities Act nowhere indicates that it is intended as the exclusive statutory remedy for securities violations. In fact, as pointed out by the plaintiffs, it specifically preserves other remedies. Section 1–506 provides, in pertinent part, that: "Nothing in this act shall limit any liability which might exist by virtue of any other statute or under common law if this act were not in effect." 70 P.S. § 1–506. "Any other statute" must encompass the CPL. We recognize that *Cabot, supra,* construed a somewhat similar provision as preserving only common law causes of action but the provision at issue in that case preserved "rights and remedies . . . that may exist at law or in equity. . . ." 394 Mass. at 726, 477 N.E.2d at 402. This language could be construed as preserving only common law remedies. In contrast, the Pennsylvania saving provision makes an explicit reference to statutory remedies.

We have no concern about the other reasons which have been advanced against permitting a cause of action under the CPL for a securities claim.

Those courts which have cited the availability of treble damages under consumer protection laws have had to deal with stat-

utes which make such damages mandatory, *see Spinner, supra; Lindner, supra,* or at least mandatory upon the satisfaction of certain conditions. *See Stephenson, supra.* In contrast, the CPL allows treble damages solely in the discretion of the court. *See* 73 P.S. § 201–9.2. *See also Smith v. Chrysler Motors Corp.,* 1990 WL 65700 (E.D.Pa.) (award of treble damages is within the discretion of the court and is appropriate under the CPL only when conduct would justify award of punitive damages).

The argument that permitting such a cause of action would create overlapping areas of authority between the Pennsylvania Securities Commission and the Bureau of Consumer Protection is speculative. We cannot, in any event, evade the plain meaning of the CPL to guard against this potential problem.

It is also true that the Pennsylvania Supreme Court looks to the FTC Act for guidance in interpreting the CPL. *See Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812 (1974). But it is for guidance only. While we cannot predict these matters with certainty, we do not think that the state supreme court would prohibit a claim under the CPL for securities violations, given the remedial nature of that statute, the broad language making it applicable here, the exemption provision failing to exempt brokerages or stock brokers, and the saving provision in the Securities Act explicitly preserving "any other statutory" remedy.

Our conclusion is consistent with the one case we have been able to locate dealing with this issue under Pennsylvania law. In *McCullough v. Shearson Lehman Brothers, Inc.,* 1988 WL 23008 (W.D.Pa.), the court denied a motion to dismiss a CPL claim based upon fraudulent securities transactions. The court reasoned as follows:

> We will deny defendants' motion to dismiss Count IV; we reject their contention that the Unfair Trade Law cannot support a claim for securities fraud.... Although the investment field is not mentioned in this Law, we must interpret

this act liberally to cover "generally all unfair and deceptive acts or practices in the conduct of trade or commerce." *Culbreth v. Lawrence J. Miller, Inc.* [328 Pa.Super. 374], 477 A.2d 491, 501 (Pa.Super.1984), quoting *Commonwealth v. Monumental Properties, Inc.* [459 Pa. 450], 329 A.2d 812, 826 (Pa.1974).

The legislature did not exclude stockbrokers from the coverage of the Law, as it could have in § 201–3 where publishers are excluded. "Exceptions expressed in a statute shall be construed to exclude all others." 1 Pa.C.S.A. § 1924 (Purdon's Supp.1987); *Culbreth, supra,* [477 A.2d] at 496. No claim can be made that the state securities laws override the Unfair Trade Law or common law remedies. 70 P.S. § 1–506 (Purdon's Supp.1987); *Ging v. Parker–Hunter, Inc.,* 544 F.Supp. 49, 52 (W.D.Pa.1982). We find that the lack of any brokerage exclusion, the liberal construction and the extensive language in the Unfair Trade Law require a denial of the motion to dismiss Count IV.

It is also consistent with *State ex rel. Corbin v. Pickrell,* 136 Ariz. 589, 667 P.2d 1304 (1983) (claim based upon securities transactions could be brought under Arizona Consumer Fraud Act after that Act was amended to provide, in part, that it was "in addition to all other causes of action" available in the State).

#### C. *The Civil Conspiracy Claim (Count X).*

■ Legg Mason asserts that the civil conspiracy claim must be dismissed because it is based upon a conspiracy between Legg Mason and Kelly. Defendant cites cases which have held that a corporation is incapable of conspiring with one of its employees, relying principally upon *Jagielski v. Package Machinery Co.,* 489 F.Supp. 232 (E.D.Pa.1980) and *Yancoski v. E.F. Hutton & Co., Inc.,* 581 F.Supp. 88 (E.D.Pa.1983).

Plaintiffs counter that two or more employees may be found capable of conspiring with each other under federal civil rights laws, *see Gant v. Aliquippa Borough,* 612

F.Supp. 1139 (W.D.Pa.1985), and that several physicians have been found capable of conspiring together although they were part of a "single entity"—the same hospital staff. *See Gordon v. Lancaster Osteopathic Hospital Ass'n, Inc.*, 340 Pa.Super. 253, 489 A.2d 1364 (1985). Plaintiffs therefore argue that it would be inappropriate to dismiss their civil conspiracy claim at this point because they may find through discovery other employees of Legg Mason who conspired with Kelly. This discovery may also reveal a conspiracy between Kelly and Legg Mason, with the latter operating through "another authorized agent of Legg Mason." (plaintiffs' brief at p. 41).

It may be possible for two or more employees of a corporation to conspire. *See St. John Mortgage Co., Inc. v. United States Fidelity And Guaranty Co.*, 1988 WL 138700 (E.D.Pa.) (corporate employees may be capable of a civil conspiracy under Pennsylvania law when acting beyond the scope of their employment or for their own personal interests), *revers'd on other grounds*, 897 F.2d 1266 (3d Cir.1990). But the plaintiffs have not sued Legg Mason employees alone. They have sued Legg Mason itself, charging it with having conspired with Kelly "and/or other Legg-Mason agents or employees." (amended complaint, ¶ 77). Thus, plaintiffs' argument that there may have been a conspiracy between Legg Mason employees has no relevance to Legg Mason's motion.

A corporation cannot conspire with one or more of its employees when those employees are acting in their authorized capacities on behalf of the corporation. *See Polay v. West Company*, 1990 WL 59351 (E.D.Pa.) (dictum). Plaintiffs have not alleged that Kelly has acted in any capacity other than that of his position as a stock broker for Legg Mason. *Compare San-*

*zone v. Phoenix Technologies, Inc.*, 1990 WL 50732 (E.D.Pa.) (corporation can conspire with corporate officers when the officers could also have been perceived as acting in their capacities as shareholders). Therefore, any conspiracy claim against Legg Mason which depends upon Kelly's involvement must fail.

Additionally, we have already concluded that discovery would be inappropriate to determine if a cause of action exists. Thus, the civil conspiracy claim cannot be upheld on the basis that plaintiffs may discover that other Legg Mason employees were involved in the alleged scheme. Further, in regard to Legg Mason's potential liability, there is no indication that discovery would reveal in what capacity these other, unknown agents of Legg Mason were operating. The civil conspiracy claim against Legg Mason will be dismissed.

D. *The Adequacy of the 10–b Claim, the Pennsylvania Securities Act Claims, And the Common Law Fraud Claim (Counts I, II, III and IX).*

 Legg Mason next attacks the adequacy of count I, the 10b–5 claim, counts II and III, the Pennsylvania Securities Act claims, and Count IX, the common law fraud claim. It asserts that these claims are deficient to the extent that they are based solely upon unauthorized trading. Citing among other cases, *Shamsi v. Dean Witter Reynolds, Inc.*, 743 F.Supp. 87 (D.Mass.1989) and *Bischoff v. G.K. Scott & Co., Inc.*, 687 F.Supp. 746 (E.D.N.Y.1986), defendant argues that unauthorized trading fails to satisfy the "in connection with" requirement of the 10b–5 claim,[2] and that reliance is lacking for the fraud claim, when plaintiffs, by the very nature of un-

---

**2.** Rule 10b–5 provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

authorized trades, could have had no knowledge of alleged omissions or misrepresentations.[3] Reliance is an essential part of a common law fraud claim. *See Mellon Bank Corp. v. First Union Real Estate Equity And Mortgage Investments*, 750 F.Supp. 711 (W.D.Pa.1990).

We reject this argument because, as the plaintiffs have correctly pointed out, the defendant has failed to take into account all of the allegations of the amended complaint.

Reading the complaint as a whole, the plaintiffs have alleged that, in the last half of April 1987, they authorized Kelly to open a securities account on their behalf with Legg Mason. (amended complaint, ¶ 8). They informed both defendants at that time, and during the subsequent operation of the account, that their "primary objective" was "long term-growth and appreciation." (¶ 9). Kelly reassured the plaintiffs while he managed their account that the activity in their account was normal and consistent with their objective. (¶ 25).

However, instead of following the plaintiffs' stated objective, the account was operated as both a margin and options account. (¶ 10). Plaintiffs had never authorized the account to be operated in this fashion, (¶ 17), and no one from Legg Mason ever informed them of the terms and conditions of such Legg Mason accounts, their characteristics, or the risks involved. (¶¶ 18 and 19). The plaintiffs' signatures on documents purportedly authorizing margin and options trading were forged. (¶ 22).

Kelly used his fiduciary relationship with the plaintiffs, and certain "false information" on the documents authorizing the margin and options trading, to assert control over the account from its inception until May 11, 1990, when Legg Mason removed him as manager of its Harrisburg office and forced him to resign as a sales agent. (¶¶ 23, 10 and 6). This control enabled Kelly to engage in a series of unauthorized securities transactions and to churn the account, all to the detriment of the plaintiffs.

It is the unauthorized nature of these transactions, coupled with the alleged failure to advise the plaintiffs of the characteristics and risks of these transactions, which defendant has seized upon in arguing that, at least to the extent that the claims are based upon unauthorized trades, they are not actionable. It is apparent, however, that the securities claims are not just based upon unauthorized trades.

The crucial allegations are that the plaintiffs informed the defendants at the beginning of their relationship that they wanted long term growth and appreciation and that, despite the defendants' awareness of this goal, both risky and unsuitable securities were purchased for the plaintiffs' account. Moreover, Kelly falsely informed the plaintiffs that the account was being handled in a manner consistent with their goal.

Both the failure to inform the plaintiffs of the true nature of the transactions and the actual misrepresentation would be the type of fraudulent conduct proscribed by Rule 10b–5 and would also satisfy common law fraud. Nor would this conduct have to be connected, at least in the instant case and in the posture in which the argument has been raised, to a purchase or sale of a particular security. *See Angelastro v. Prudential–Bache Securities, Inc.*, 764 F.2d 939 (3d Cir.1985); *In re Catanella*, 583 F.Supp. 1388 (E.D.Pa.1984).[4] We would also note our belief that churning is actionable under Rule 10b–5. *See In re Catanella.*

---

**3.** The defendant does not elaborate on how this argument also applies to the Pennsylvania Securities Act claims.

**4.** For this reason, we also reject the defendant's argument that the forgery of the documents purporting to authorize the margin and options trading is not actionable because the plaintiffs cannot show how the forgery affected a decision to buy or sell a security. Forged documents, of course, would have facilitated the margin and options trading.

E. *The Specificity of the 10–b Claim, the Pennsylvania Securities Act Claims, And the Common Law Fraud Claim Counts I, II, III and IX.*

■ Relying upon Fed.R.Civ.P. 9(b), requiring specificity in the pleading of fraud, Legg Mason has also attacked the specificity of counts I, II, III and IX as they relate to the averments of churning, a constructive fraud, *see Roche, infra,* and the purchase of "unsuitable" investments.

Defendant contends that the churning allegations in paragraph 24 are too vague because they merely recite in conclusional fashion the case law definition of churning without setting forth facts "which would permit a determination of either the turnover ratio of the account, *or* the percentage of the account value paid in commissions." *Roche v. E.F. Hutton & Co., Inc.,* 603 F.Supp. 1411, 1416 (M.D.Pa.1984) (emphasis in original) (quoted case omitted). In pertinent part, paragraph 24 alleges that Kelly "initiat[ed] transactions in the account that were excessive in view of the Plaintiffs' investment goals and the character of the account ... [which] included frequent in-and-out trading of securities...." (brackets added).

Citing *Gopez v. Shin,* 736 F.Supp. 51 (D.Del.1990), plaintiffs counter that, by identifying the account, and by pleading the time period during which it was churned along with the elements of a churning claim, they have met their pleading requirement. Given the particular allegations of the amended complaint, we agree with the plaintiffs.

Those allegations identify the particular account which was the subject of the churning claim, the time frame within which the alleged churning occurred, April of 1987 until May 11, 1990, (amended complaint, ¶ 24), and those transactions which were authorized and approved by the plaintiffs, thereby identifying as well the unauthorized trades. (¶ 14). Additionally, the plaintiffs have identified as part of their churning claim the options and warrants transactions in their account, (¶ 24), and have identified specific stocks as examples of stock which was unsuitable for their account, given their investment goal. (¶ 16). These allegations are sufficient for the defendant to determine the approximate turnover ratio or the amount of excessive commissions. *Compare Roche, supra,* 603 F.Supp. at 1419–20 (allegations which merely cite certain trades deemed inappropriate by the plaintiff are insufficient for a churning claim).

We realize that plaintiffs in other cases have provided more detail by way of attaching monthly account statements to their complaint, citing examples from the statements of churning, and estimating the turnover ratio for the chosen months or illustrative time period. *See Roche, supra,* 603 F.Supp. 1417 n. 5; *Gopez, supra; Prodex, Inc. v. Legg Mason Wood Walker, Inc.,* 1987 WL 6329 (E.D.Pa.). But as noted by the court in *Gopez,* these more specific allegations would not necessarily be more helpful in determining the validity of the churning claim. We would also note that the plaintiffs need not allege the turnover ratio or the percentage of account value paid in commissions. Rather, they need only provide sufficient facts so that the defendant can make these calculations. *Gopez.* We believe the plaintiffs have done that here.

Legg Mason has also contested the specificity of the plaintiffs' separate claim that "unsuitable" stock was chosen for their account. To the extent that the purchase of unsuitable stock was part of a fraudulent scheme or practice, specificity would be required.

As noted, paragraph 16 of the amended complaint lists specific examples of stock the plaintiffs considered unsuitable because they were "highly speculative" and also alleged that the "other unauthorized purchases of securities traded over-the-counter" were unsuitable as well. As also noted, the plaintiffs elsewhere in the complaint additionally alleged that they wanted long term growth and appreciation. We believe that these allegations are specific enough for an unsuitability claim. *See Gopez, supra.*

F. *The Statutes of Limitations For The 10b–5 Claim and The Pennsylvania Securities Act Claims (Counts I, II and III).*

1. *The 10b–5 Claim.*

██ In *In re Data Access Systems Securities Litigation,* 843 F.2d 1537, 1550 (3d Cir.1988) (en banc), the Third Circuit held that 10b–5 claims would be subject to a statute of limitations barring actions brought more than "one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation." The original complaint in the instant case was filed on September 28, 1990. Legg Mason therefore argues that the 10b–5 claim is barred to the extent it is based on transactions in the account occurring prior to September 28, 1987. Additionally, because the plaintiffs failed to allege fraudulent concealment with sufficient specificity, the claim is barred to the extent it is based on transactions occurring prior to September 28, 1989.

In opposition, plaintiffs assert that, despite their attempt to plead facts which would defeat a statute of limitations defense, they had no obligation to do so. Thus, defendant cannot rely on these allegations to attack plaintiffs' 10b–5 claim. In any event, the allegations are sufficiently specific and resolution of the limitations issue must await another stage of the litigation.

We need not resolve the issue of whether plaintiffs had the duty of pleading facts which would show that their claim was timely. Once the plaintiffs decided to address the limitations issue in their complaint, the defendant was entitled to challenge by motion the adequacy of the averments of fraudulent concealment. *See Alfaro v. E.F. Hutton & Co., Inc.,* 606 F.Supp. 1100, 1107 (E.D.Pa.1985); *Fitch v. Radnor Industries, Ltd.,* 1990 WL 150110 (E.D.Pa.).

However, contrary to the defendant's position, the plaintiffs need not further allege facts which would support their due diligence in attempting to discover the fraud. Legg Mason quotes the following language

from *Alfaro, supra,* to support that contention: "[T]he complaint must set forth the time and circumstances of the discovery of the fraudulent statements … and the diligent efforts which plaintiff undertook in making or seeking such discovery." 606 F.Supp. at 1112. (brackets added) (quoted case omitted). But at that point in the opinion, the court was discussing the necessary allegations for a claim under section 12(2) of the Securities Act of 1933, which, because it established its own limitations period for section 12(2) actions, *see* 15 U.S.C. § 77m, required allegations of due diligence in the complaint.

In the instant case, we are dealing with a 10b–5 claim, governed by a judicially created limitations period borrowed from the Securities and Exchange Act of 1934. *See In re Data Access, supra,* 843 F.2d at 1550. Therefore, we need only concern ourselves with whether the plaintiffs, having raised fraudulent concealment in their complaint, have pled an adequate factual support for that position. *See Alfaro, supra,* 606 F.Supp. at 1107.

██ Plaintiffs' allegations of fraudulent concealment are set forth in paragraph 25 of their amended complaint:

Plaintiffs did not discover the improprieties or violations alleged herein until after Sept. 18, 1989. Moreover, from the opening of the account in April of 1987 and throughout the time period up to and including May 11, 1990, Kelly utilized the trust and confidence of Plaintiffs, his expertise and an ongoing series of representations, omissions, obfuscations and other actions to withhold from Plaintiffs, and confuse or delay Plaintiffs' discovery of, the true status of their account and the nature of the transactions Kelly initiated in their account by, *inter alia,:* asserting that account statements did not accurately reflect trades in the Plaintiffs' account; urging Plaintiffs not to be concerned with particular transactions but to rely on Kelly's strategies to make them money overall; assuring Plaintiffs that Kelly would "look into" items questioned by the Plaintiffs and get back to

them if anything improper had occurred; and reassuring Plaintiffs that the activities in their account were normal and consistent with Plaintiffs' objectives.

These allegations are not sufficiently specific. The plaintiffs speak in conclusional language of "an ongoing series of representations, omissions, obfuscations and other conduct" which prevented them from finding out what was really happening in their account. The plaintiffs do list some specific examples, but by using the term "*inter alia,*" they signal they are also relying upon other conduct they have not specified in the complaint. In any event, the examples given are not specific enough because the plaintiffs have also not set forth how often these events happened, when they happened, and the circumstances under which these communications were made to the plaintiffs, including who initiated the contact leading to the communications and whether they were written or oral. *See Alfaro, supra.*

The substance of the communications may also not be exact enough. Plaintiffs should allege, for example, what trades, if any, may have been at issue when Kelly said that the account statements were not accurate, what particular transactions, if any, were of concern when he advised them to rely upon his overall strategy, and the items he was going to look into for the plaintiffs.

Without more specificity, we cannot say if conduct more than one year before the beginning of this lawsuit is actionable. But we will not rule against the plaintiffs at this time, as the defendant urges us to do. Rather, plaintiffs will be given leave to file an amended complaint to see if they can cure the deficiencies in their allegations of fraudulent concealment.

 As to conduct more than three years before the lawsuit started, we agree with the defendant that a 10b–5 claim based on such conduct is now time barred. The three year limitations period adopted by the Third Circuit in *In re Data Access, supra,* is a statute of repose and is not subject to equitable tolling. *Id.* Thus, the discovery rule or fraudulent concealment is not relevant to this portion of the claim and we will dismiss it to the extent it is based on the defendants' conduct occurring more than three years before the lawsuit started.

### 2. *The Pennsylvania Securities Act Claims.*

For the state securities causes of action set forth in Counts II and III of the amended complaint, the Securities Act provides a limitations period of "four years after the act or transaction constituting the violation" or "one year after the plaintiff receives actual notice or upon the exercise of reasonable diligence should have known of the facts constituting the violation, whichever shall first expire." 70 P.S. § 1–504(a) (Purdon Supp.1990–91).

Based upon the same argument made above concerning the inadequacy of plaintiffs' averments of fraudulent concealment, Legg Mason argues that the state law securities claims must be dismissed to the extent that they are based upon conduct occurring more than one year before the lawsuit was initiated. We must in turn, based upon our analysis above, reject this argument.

### G. *The Statute of Limitations And the Pendent State Common Law Claims (Counts V, VI, VII and IX).*

Legg Mason contends that Counts V, VI, VII, and IX, setting forth claims for breach of fiduciary duty, negligence, conversion, and common law fraud must be dismissed to the extent that they are based upon conduct occurring more than two years prior to the filing of the original complaint. *See* 42 Pa.C.S. § 5524(7).

The discovery rule would apply to these causes of action. *See generally Garcia v. Community Legal Services Corp.,* 362 Pa. Super. 484, 524 A.2d 980 (1987). Accordingly, based upon our foregoing discussion of the plaintiffs' allegations of fraudulent concealment we will deny defendant's motion.

We will issue an appropriate order.

## ORDER

AND NOW, this 20th day of March, 1991, upon consideration of the motion to dismiss filed by defendant, Legg Mason, it is ordered that:

1. Counts X and XII of the complaint, the civil conspiracy claim and RICO claim, respectively, are dismissed without leave to amend, as against the defendant Legg Mason only.

2. The motion to dismiss Counts I, II and III for failure to plead fraudulent concealment with sufficient specificity is granted for conduct occurring prior to September 28, 1989, and for Counts V, VI, VII and IX for conduct occurring prior to September 28, 1988, except that plaintiffs are hereby given leave to file a second amended complaint by April 10, 1991, which cures the deficiencies in the amended complaint noted in the accompanying memorandum.

3. The motion to dismiss Count I, the 10b–5 claim, is granted as to Legg Mason to the extent the claim is based upon conduct that occurred prior to September 28, 1987.

4. In all other respects, Legg Mason's motion to dismiss is denied.